Marilyn J. BARTLETT, Plaintiff,

v.

NEW YORK STATE BOARD OF LAW EXAMINERS; James T. Fuller, Individually and as Executive Secretary, New York State Board of Law Examiners; John E. Holt–harris, Jr., Individually and as Chairman, New York State Board of Law Examiners; Richard J. Bartlett, Individually and as Member, New York State Board of Law Examiners, Laura Taylor Swain, Individually and as Member, New York State Board of Law Examiners, Charles T. Beeching, Jr., Individually and as Member, New York State Board of Law Examiners and Ira P. Sloane, Individually and as Member, New York State Board of Law Examiners, Defendants.

No. 93 Civ. 4986(SS).

United States District Court,
S.D. New York.

Aug. 15, 1997.

Jo Anne Simon, Patricia Ballner, Brooklyn, New York, for Plaintiff.

Dennis Vacco, Attorney General of the State of New York, New York, NY, Judith T. Kramer, Rebecca Ann Durden, Assistant Attorneys General, for Defendants.

## MEMORANDUM OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendants move, pursuant to ·Fed. R.Civ.P. 59(e) and 60(b), for amendment of the judgment or relief from the decision and order of this Court rendered on July 3, 1997 (the "Opinion"), familiarity with which is assumed. For the reasons to be discussed, defendants' motion is **DENIED**.

### I. The Court's Use of The EEOC Regulations Under Title I of the ADA

A. *The Appropriateness of Employing Title I Regulations Generally*

▬ In its Opinion, the Court used the regulations promulgated by the EEOC under Title I of the Americans with Disabilities Act (the "ADA" or the "Act") to elucidate and expand upon the Court's understanding of the concept of "substantial limitation" as it relates to defining who is disabled under the Act. The Court employed the Title I regulations for this purpose even though plaintiff's claim was brought under Titles II and III of the Act, and the Department of Justice, not the EEOC, is charged with promulgating regulations pursuant to those titles. While neither party directly challenges the Court's use of the EEOC regulations and interpretive guidance, the tenor of the defendants' instant motion for reconsideration implies that the use of the Title I regulations was somehow inappropriate.[1] The Court disagrees for the following reasons.

Initially, one must understand, how, if at all, regulations under Title I and Title II differ, keeping in mind that the statutory definition of "disabled" is the same for all titles of the Act and. that no agency is imbued with dispositive authority to state what the term means. The only difference between the Title I regulations promulgated by the EEOC and the Title II regulations

---

1. The Defendants only raise the question vaguely in a footnote in their brief:

    Both this Court and the court in *Price* rely upon EEOC regulations for guidance even though they pertain only to Subchapter I which addresses workplace discrimination and neither this case nor *Price* were filed against

    employers nor do they involve discrimination in the workplace.

    (Defs.' Brief at 4 n. 2). Although defendants raise the question, they do not discuss it further, nor do they explain why they likewise relied upon the EEOC regulations in presenting their arguments to the Court.

promulgated by the Justice Department is that the EEOC goes to much greater lengths to explore the concept of substantial limitation, particularly as that concept relates to the major life activity of working. Both sets of regulations define a disability—according to the statutory definition—as an impairment that substantially limits any major life activity. Both regulations list the following examples of major life activities: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*." 29 C.F.R. § 1630.2(i) (Title I regulation) (emphasis added); 28 C.F.R. § 36.104(2) (Title II regulation) (emphasis added).

Clearly, then, the Department of Justice in promulgating rules under Title II contemplated an assessment of a plaintiff's impairment under the major life activity of working. The only question is whether the Department of Justice regulations under Title II forecloses application of the EEOC's interpretation that substantial limitation in the context of the major life activity of working should be measured by a different reference population—by a comparison to "the average person with comparable training, skills and abilities" 29 C.F.R. § 1630.2(j)(1)(ii) rather than "the average person in the general population." 29 C.F.R. § 1630.2(j)(3)(i).[2] I hereby reaffirm my prior conclusion that the EEOC's interpretation of substantial limitation in the context of the major life activity of working is both a part of, and consistent with, the Department of Justice's regulations and the purpose of the ADA.

I reach this conclusion in part because of the cooperative spirit in which the regulations were promulgated. *See, e.g.,* I Henry H. Perritt, Jr., *Americans With Disabilities Act Handbook* § 1.9 (3d ed.1997) (discussing the fact that the Justice Department and EEOC regulations were issued jointly, as required by § 107(b) of the ADA). In addition, the Department of Justice's own "[r]ule of interpretation," under Title II provides: "Except as otherwise provided in this part, this part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 ... or the regulations issued by Federal agencies pursuant to that title." 28 C.F.R. § 36.103. Notably, the Rehabilitation Act now looks to the standards established by Title I of the ADA and the regulations promulgated thereunder. *See* 29 U.S.C. § 793(d) (providing that "[t]he standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act").

In its analysis of this "rule of interpretation," the Justice Department has even more pointedly written: "Title II, however, also incorporates those provisions of titles I and III of the ADA that are not inconsistent with the regulations implementing section 504. Therefore, this part also includes appropriate provisions derived from the regulations implementing those titles." 28 C.F.R. § 35.103, App. A, *reprinted in,* Arlene B. Mayerson, ed., *Americans With Disabilities Act Annotated: Legislative History, Regulations & Commentary* Title II – 25 (1997); *see also* H.R.Rep. No. 101–485 at 49–51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 472–74 ("Title II should be read to incorporate provisions of titles I and III which are not inconsistent with the regulations implementing Section 504 of the Rehabilitation Act of

---

**2.** The Justice Department regulations under Title II merely define the phrase "major life activities", without giving any definition of "substantial limitation" or any reference to whether or what comparison should be made in finding a substantial limitation. In its analysis of the definition of "major life activities," the Department only discusses the concept of substantial limitation briefly, without defining what it means. Its analysis explains that "[a] person is considered an individual with a disability ... when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." U.S. Equal Employment Opportunity Commission & U.S. Department of Justice, *Americans With Disabilities Act Handbook* II–20 (1992). What the Department neglects to explain is whether "most people" refers to most people in the general population *or to most people engaging in that particular life activity.* Obviously, such a distinction is of critical importance in this context.

1973.... However, nothing in the other titles should be construed to lessen the standards in the Rehabilitation Act regulations which are incorporated by reference in Section 204."); U.S. Equal Employment Opportunity Commission & The Department of Justice, *Americans with Disabilities Act Handbook* I–3 (1992) ("It is the intent of Congress that the regulations implementing the ADA be comprehensive and easily understood. Part 1630 [promulgated by the EEOC], therefore, defines terms not previously defined in the regulation implementing section 504 of the Rehabilitation Act, such as "substantially limits ..." Where possible, part 1630 establishes parameters to serve as guidelines in such inquiries.").

From these two statements, it is self-evident that the Department of Justice's own "rule of interpretation" sanctions the use of regulations from a different title to help lend meaning to a concept that is not addressed in its own regulations, *see* note 2, *supra,* provided that the other regulations do not impose or permit a "lesser standard." Here, the Title I regulation merely determines the appropriate characteristics—comparable training, skills, and abilities—of the persons within the general population against which a substantial limitation is measured in the context of the major life activity of working. The EEOC's conclusion, therefore, does not provide a lesser standard. Moreover, it is perfectly consistent with the Rehabilitation Act, as well as Title II and the remedial nature of the ADA as a whole, and has a sound basis in logic. Thus, the Court's invocation of the Title I regulations as a meaningful interpretive tool was consistent with general rules of statutory interpretation. *See, e.g., Silverman v. Eastrich Multiple Investor Fund,* 51 F.3d 28, 31 (3d Cir.1995) (explaining that there is "a basic tenet of statutory construction, equally applicable to regulatory construction, that a statute 'should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.' ") (citation omitted); *Bower v. Federal Express Corp.,* 96 F.3d 200, 209–10 (6th Cir.1996) (arguing that the better choice is to use another regulation for interpretative guidance rather than interpret a term "without regulatory assistance"); *Yeskoo v. United States,* 34 Fed.Cl. 720, 734 (1996) (providing that "[i]n construing a statute, courts should attempt not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless or superfluous.... The meaning of statutory language depends on context, and a statute should be read as a whole.... Therefore, when reviewing the statute and regulations at issue in this case, this court must construe each part of a statute in connection with all the other sections, so as to produce a harmonious whole. Moreover, common sense requires that the same words used twice in the same act should have the same meaning."); *United States v. Hayashi,* 22 F.3d 859 (9th Cir.1993) (providing that a defendant can not be convicted under the regulations of a statute different from that under which he was indicted, but that nevertheless "a regulation implementing a different statute might aid in interpreting those under another statute."); *Price v. The National Board of Medical Examiners,* 966 F.Supp. 419, 426 & n. 2 (S.D.W.Va.1997) (employing the Title I regulations in a Title II case, and explaining that "The EEOC guidelines do not govern [Title II] because the guidelines pertain only to Subchapter I. However, Congress clearly intended for the term 'disability' (and, therefore, the phrase 'substantially limits') to have a uniform meaning throughout the ADA. Accordingly, wherever possible, the Court must define the phrase 'substantially limits' in a manner consistent with each of the agencies' interpretations."); *Medical Society of New Jersey v. Jacobs,* 1993 WL 413016 (D.N.J. 1993) (importing Title I requirements into Title II context); *Ellen S. v. Florida Board of Bar Examiners,* 859 F.Supp. 1489 (S.D.Fla.1994) (applying Title I standard regarding pre-employment inquiries to Title II case involving bar application).

### B. The Appropriateness of Invoking the Major Life Activity of Working

#### 1. The Court Considered Other Major Life Activities First

■ As previously explained, the defendants do not directly challenge the Court's

reliance upon the Title I regulations. In fact, defendants invoke the Title I regulations promulgated by the EEOC as the correct test for assessing disability under the Act. (*See* Defs.' Brief at 3). However, looking to the EEOC regulations, the defendants contend that the Court erred by analyzing plaintiff's impairment as one which impacts the major life activity of working "without first determining whether [plaintiff's impairment] substantially limits her ability to read or learn . . . ." (Defs.' Brief at 4).

Defendants seem to suggest that it only would have been appropriate for the Court to look to the major life activity of working if it first found that plaintiff was substantially limited in other major life activities. In fact, the reverse is true. If the Court had found, *which it did not,* that plaintiff was substantially limited in any other major life activity, it would have been prevented, by the EEOC analysis, to consider the effect of plaintiff's impairment on any other major life activity, and specifically the major life activity of working. If, however, as was the case, the Court found that plaintiff was *not* substantially limited in the other major life activities, it had a duty to see whether plaintiff was substantially limited in the major life activity of working. *See* 29 C.F.R. Pt. 1630, App., § 1630.2(j).

The interpretive guidance to the EEOC regulations clearly provide that:

> If an individual is not substantially limited with respect to any other major life activity, *the individual's ability to perform the major life activity of working should be considered.* If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.

29 C.F.R. Pt. 1630, App., § 1630.2(j) (emphasis added). In explaining why other major life activities should be considered before the major life activity of working, the EEOC has written:

> Most of the discussion and analysis of substantial limitation has focused on its meaning as applied to the major life activity of working. This is largely because there has been little dispute about what is meant by

such terms as "breathing" "walking" "hearing" or "seeing" but much dispute about what is meant by the term "working." Consequently, the determination of whether a person's impairment is substantially limiting should first address major life activities other than working. If it is clear that a person's impairment substantially limits a major life activity other than working, then one need not determine whether the impairment substantially limits the person's ability to work. *On the other hand, if an impairment does not substantially limit any of the other major life activities, then one must determine whether the person is substantially limited in working.*

> For example, if an individual's arthritis makes it unusually difficult (as compared to most people or to the average person in the general population) to walk, then the individual is substantially limited in the ability to walk. In that case, one would not need to ascertain whether the individual is also substantially limited in working. If, however, it was not clear whether the person's impairment substantially limited his/her ability to walk (or to perform other major life activities), then one would have to analyze whether the impairment substantially limited the person's ability to work.

*EEOC Compliance Manual* § 902—Definition of the Term "Disability"—*reprinted in* Arlene B. Mayerson, *Americans with Disabilities Act Annotated: Legislative History, Regulations & Commentary* App.P. at p. 27 (1994) (emphasis added).

In its Opinion, the Court did the very analysis that defendants insist should have been done by the Court. The Court first considered whether plaintiff was "substantially limited" in her reading when compared to the average person in the general population. Finding that plaintiff's history of self accommodation enabled her to perform marginally as well as the average person in the general population, the Court concluded that plaintiff was not substantially limited when compared to this population. (*See* Opinion at 56 (stating that when plaintiff's reading skills are compared to the average person in the

general population, she would be considered "barely average.")) Then, and only then, did the Court embark on its analysis of whether plaintiff's impairment substantially limited her ability to work. Using the benchmark of "the average person having comparable training, skills and abilities," 29 C.F.R. § 1630.2(j)(3)(i), the Court found that plaintiff was substantially limited and therefore "disabled" under the law. There is nothing in the law, the regulations, or the EEOC guidance to suggest that this analysis was anything but appropriate.

## 2. The Appropriateness of Invoking the Major Life Activity of Working

■ Despite framing the bulk of their argument in terms of the Court's purported failure to consider other major life activities before considering the major life activity of working, it appears that what actually troubles the defendants is that the major life activity of working was invoked at all. To this end, the defendants place tremendous (and almost exclusive) weight in their reconsideration memorandum on a case from the Southern District of West Virginia, *Price et al. v. The National Board of Medical Examiners*, 966 F.Supp. 419 (S.D.W.Va. June 6, 1997). Although the case and the arguments found therein have superficial appeal, especially as applied to the limited facts and legal argument before that court, upon closer examination they are revealed as unpersuasive authority for the issues before this Court.

*Price* involved a suit for injunctive relief brought by medical students who were seeking additional time and other accommodations on the medical licensing examination administered by the National Board of Medical Examiners. According to the opinion, medical students are required to pass "Step 1" of the examination before proceeding on in their medical school education. This factual context differs markedly from the instant case, of course, where the plaintiff has completed all of the necessary schooling required to practice as a lawyer and where the only

obstacle remaining between her and the practice is her passing the bar examination.

After a limited evidentiary hearing (as opposed to the very lengthy trial and voluminous submissions in this case), the *Price* court found that the plaintiffs' "history of significant scholastic achievement" *id.* at 427, in college and medical school evinced the fact that the plaintiffs were not substantially limited in their ability to learn as compared to "most unimpaired persons." *Id.* at 425. Analyzing all of the plaintiffs' impairments under the major life activity of learning (without any mention of the major life activity of working), the Court found that the plaintiffs were "able to learn as well as or better than the average person in the general population." *Id.* at 422. Hence, the court found that the plaintiffs were not disabled under the law.

*Price* differs from the instant case in an important factual respect. The *Price* plaintiffs all claimed they had Attention Deficit Hyperactivity Disorder ("ADHD").[3] Thus, their very claims went to their ability to learn, which was belied by their significant achievements in education. However, in the instant case, plaintiff's so-called "learning" disability is in actuality a difficulty in reading words—not in learning *per se*. This is an important distinction because plaintiff's significant accomplishments in education do not belie her claim that she has significant difficulty reading.

In reaching its ultimate conclusion that the plaintiffs were not disabled, the *Price* Court raised the following concern:

> The ADA is not designed "to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering front door." Jamie Katz & Janine Valles [sic], The Americans with Disabilities Act and Professional Licensing, 17 Mental & Physical Disability L.Rep. 556, 561 (Sept./Oct. 1993). If a court were to grant testing

3. Although two of the three plaintiffs had been diagnosed with "Disorder of Written Expression and Reading Disorder," *Price*, 966 F.Supp. at

422, *Price* discussed their impairment, and limited its analysis, to a "learning" disability in the strictest sense of that word.

accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions though the proverbial back door. In so undermining the integrity of the USMLE, that court would hinder the Board's ability to distinguish between qualified students and unqualified students.

*Price*, at 421–22. This argument is reminiscent of the defendants' claims in the instant case. It is true that if nondisabled individuals were granted accommodations on the examination, the examination's integrity would be compromised.[4] What the defendants and the *Price* court fail to recognize, however, is the impact of measuring applicants' impairments against inappropriate reference characteristics and how that practice would systematically result in persons with legitimate impairments being found not disabled under the Act, thereby seriously compromising the purpose of the Act, which is to employ disabled individuals to their fullest potential.

■ By measuring a disability for purposes of a professional examination against a reference population that would otherwise be totally unprepared and unqualified to take such an examination, the findings of such applicants' disability is automatically skewed against a finding of disability. The ADA and its dictates are highly context-specific. *See, e.g.*, 29 C.F.R. Part 1630 App., § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

Therefore, one can not look to whether an individual is disabled, without considering in what context the individual might be "substantially limited." For example, the *EEOC Technical Assistance Manual* provides:

> An individual who had been employed as a reception-clerk sustained a back injury that resulted in considerable pain. The pain permanently restricted her ability to walk, sit, stand, drive, care for her home and engage in recreational activities. Another individual who had been employed as a general laborer has sustained a back injury, but was able to continue an active life, including recreational sports, and had obtained a new position as a security guard. The first individual was found by a court to be an individual with disabilities. The second individual was found not significantly restricted in any major life activity and therefore not an individual with a disability.

*EEOC Technical Assistance Manual* at II–4 to 5. Because context is a very important part of the ADA, it would be incongruous to examine a person's impairments outside of the context in which the impairment affects their lives or livelihoods.

Hence, by failing to measure an applicant's disability against the appropriate reference group—those engaging in that particular activity, or, in the words of the EEOC, those with "comparable training, skills and abilities"—applicants are placed in a horrific Catch 22. If an applicant strives hard enough to prove him or herself a "qualified individual" who has completed the prerequi-

---

4. It is important to underscore that bar examinations, like many other licensing examinations, purport to test technical knowledge and expertise and not reading speed or fluidity. This Court has specifically found, and the Bar Examiners conceded at trial, that neither reading speed or automaticity are tested on the New York Bar Examination. *See* Opinion at 74, 78–79. Often, one scholar has noted, concerns that the integrity of examinations may be compromised by granting accommodations to the learning disabled are premised on the fallacy shared by many licensing examiners that "applicants with learning disabilities are either slow readers without any real impairment—and therefore not disabled—or not bright enough to pass the pertinent exam." Deborah Piltch et al., *The Americans With Disabilities act & Professional Licensing*, 17 Mental & Physi-

cal Disability L.Rep. 556, 558 (Sept./Oct.1993). This fallacy appeared to affect the attitudes of some of the defendants in the instant case. *See* Opinion at 91–92. Unlike the *Price* Court, however, this Court has found that the plaintiff before it is not a slow reader but rather is a person with an impairment that affects her ability to read with the automaticity and speed of the average person with comparable training, skills and abilities. *See* Opinion at 69–70. Care must be taken by courts (as Dr. Hagen noted is taken by trained psychologist in diagnosing learning disabilities) not to equate the legal effects of slow reading that arises from an impairment with the legal effects of slow reading arising from intelligence, educational, or emotional problems. The law does not protect the latter but it does require accommodation for the former.

sites for sitting for an examination and who is otherwise capable of performing within the profession, he or she is—almost by definition and by the very nature of his or her accomplishments in graduate work—"average" when compared to the general population.

The bar and medical licensing examinations are not "average" tests geared to "average" persons, however. These sophisticated, professional tests are designed to challenge the analytical abilities of generally above-average achievers. Hence, by failing to employ the major life activity of working standard when a person's entrance into a profession is at stake,[5] courts deny applicants the opportunity to compete on a level playing field when there is no doubt that once the applicants were employed within the profes-

sion their disabilities would have to be recognized and accommodated under Title I.

This result is contrary to the remedial nature of the statute, and to Congress' unequivocal desire to employ disabled individuals up to their full potential. *See* S.Rep. No. 101–116, at 9 (1989) ("Individuals with disabilities experience staggering levels of unemployment and poverty. According to a recent Lou Harris poll not working is perhaps the truest definition of what it means to be disabled in America."). Although it can not be said that Dr. Bartlett is unemployed or unemployable, this does not assuage Congress' apparent concern for the employment difficulties of the disabled in America.[6] It is little consolation to tell disabled individuals that they can seek other forms of employ-

5. The argument could be made that many, if not most, standardized tests such as the LSAT, or even the SAT, have an effect on a person's ability to enter a profession to the extent they affect a person's ability to gain the other credentials necessary to enter that profession. Those tests, however, are more generic intelligence tests, and, therefore, are more geared to the average population. Even more importantly, those tests are a considerably less proximate cause for denial of employment in any given area and hence the major life activity of working standard is much less appropriate in that context. Nevertheless, the Court does not have before it such a case. In the instant case, the plaintiff has already successfully achieved all of the requirements for being a lawyer; she merely lacks the license to practice. On any level, the bar examination at issue is a much more appropriate context for employing the major life activity of working than other standardized tests.

6. *See* S.Rep. No. 101–116, at 10 (noting among other employment obstacles, disabled individuals' "under-employment"); 135 Cong.Rec. S10712, (daily ed. September 7, 1989) (Statement of Sen. Harkin) (providing that "people with disabilities as a group occupy an inferior status ... vocationally ..."); 135 Cong.Rec. S10717 (daily ed. September 7, 1989) (Statement of Sen. Kennedy) ("Disabled citizens deserve the opportunity to work for a living, ... and do all the other things that the rest of us take for granted."); 135 Cong.Rec. S10789 (daily ed. September 7, 1989) (Statement of Sen. Kennedy) ("With the challenge facing our country, we cannot afford to ignore the talent of the disabled, or neglect the skills they have to offer."); 135 Cong. Rec. S 10791 (daily ed. September 7, 1989) (Statement of Sen. Riegle) (explaining that "our economy can no longer afford not to enlist the unique abilities and talents of people with disabilities."); 135 Cong.Rec. S10792–92 (daily ed.

September 7, 1989) (Statement of Sen. Biden) ("Too many disabled persons have been locked out of the American workplace, excluded from jobs for which they are more than capable.... [T]oo many people fail to see the intelligence, energy, and potential of millions of Americans. Disabled Americans are not asking for pity or for a handout. They are asking for a *fair chance to compete and take part on an equal basis....*") (emphasis added); 136 Cong.Rec. H2433 (daily ed. May 17, 1990) (Statement of Rep. Luken) ("In short, this bill will help our country use an immense amount of talent, intelligence, and other human resources which heretofore have been underestimated, underdeveloped, and underutilized."); 136 Cong.Rec. H2446 (daily ed. May 17, 1990) (Statement of Rep. Gallo) ("For too long, Americans with mental and physical disabilities have been prevented from performing many daily activities of living and from fulfilling dreams of employment, prosperity, and full participation in our communities. Not only has this been a great loss to our communities and to our economy, it has also been an added hardship to the individuals who have struggled so valiantly to overcome the obstacles imposed by their disabilities and for their families who have been by their side all along."); 135 Cong.Rec. S4997 (daily ed. May 9, 1989) (statement of Sen. Cranston) (providing that the "single purpose" of the ADA is "to help ensure that persons with disabilities have the opportunity—freed of the shackles of discriminatory practices—to participate in our society as fully as possible and, thus, to achieve their full potential."); 136 Cong.Rec. H2427 (daily ed. May 17, 1990) (Statement of Rep. Hoyer) ("This bill does not guarantee a job—or anything else. It guarantees a level playing field; the qualified individuals won't be discriminated against because of their disability."); 136 Cong. Rec. H2440 (daily ed. May 17, 1990) (Statement of Rep. Fish) ("This bill aims at opening up opportunities for all persons with disabilities.").

ment, but cannot seek employment in fields in which they studied for years. Understanding as it did the employment obstacles that the disabled face in this country, it could not have been Congress's intent to exclude the disabled from participating in large classes of customary professions, such as medicine and the law, merely because they can not receive the accommodations on a licensing exam—accommodations which the law would require them to be given once they began work for an employer. Such a result would be abhorrent—the disabled would be relegated to some form of an underclass—able to practice in jobs that do not require licensing, but wholesale excluded from some of the most prestigious, lucrative, and rewarding professions in our society which do require licensing. Hence I find that the use of the major life activity of working standard and its comparison to the average person of comparable training, skills and abilities was appropriate and consistent with the spirit and letter of the Act.

## II. Plaintiff's Purported Failure to State on Her Accommodation Application that She Was Impaired in Her Ability to Work

■ Finally, defendants argue that in order to recover damages under the Act, plaintiff was required to state on her accommodation application that she was disabled in the major life activity of working. Clearly, the law imposes no such obligation on the plaintiff in order to receive a remedy under the ADA. The major life activity of working is only part of a legal analysis which helps courts and investigators determine whether a

given plaintiff is "substantially limited" and therefore "disabled" as that term is defined under the law. It is not a prerequisite to filing a complaint or to recovery.[7] What these forms, and the ADA, require is that plaintiff list her *impairment*, not what it substantially limits.[8] Plaintiff's impairment is a learning disability that manifests itself in a difficulty in reading and understanding the written word with automaticity; plaintiff expressed this clearly on her application. She was under no obligation to tell defendants more or to explain to defendants that they should consider some of her marginal reading skills in the context of the type of test at issue and the nature of the skills of the population taking the test. By relying exclusively upon an expert whose approach rejects the generally accepted discrepancy theory in identifying learning disabilities, defendants themselves chose to ignore the full context specific dictates of the ADA and Rehabilitation Act.

### CONCLUSION

For the reasons discussed, defendants' motion for reconsideration is **DENIED**.[9]

**SO ORDERED.**

7. Defendants argue that plaintiff should not recover her expenses expended on at least three of the bar examinations because she did not timely apply for accommodations on two of them, and she was granted accommodations on the third. As for the two examinations in which plaintiff's application for accommodations may have been untimely, the Court finds defendants' argument to be specious. The defendants have consistently through the years considered untimely applications. Moreover, the letters denying accommodations for these two tests made clear that the Board considered the lack of merit in plaintiff's application as the primary reason for denying an accommodation. And, as for the third examination on which the Board actually did grant accommodations, recovery is merited given that the

accommodations granted were neither those that the plaintiff requested nor those to which the Court has deemed plaintiff was entitled.

8. The Court notes that there is no such thing as a *per se* working disability, and certainly none has been recognized by the ADA. Therefore, virtually every impairment that substantially limits the major life activity of working will have, in actuality, some other form of impairment at its root, such as asthma, reading, walking, writing; etc.

9. Because I find that defendant's motion, while perhaps in poor judgment, is not frivolous, I hereby deny plaintiff's motion for sanctions under Rule 11.