### Marilyn J. BARTLETT, Plaintiff–Appellee,

v.

### NEW YORK STATE BOARD OF LAW EXAMINERS, James T. Fuller, individually and as Executive Secretary, New York State Board of Law Examiners, John E. Holt–Harris, Jr., individually and as Chairman, New York State Board of Law Examiners, Richard J. Bartlett, individually and as member, New York State Board of Law Examiners, Laura Taylor Swain, individually and as member, New York State Board of Law Examiners, Charles T. Beeching, Jr., individually and as member, New York State Board of Law Examiners, and Ira P. Sloane, individually and as member, New York State Board of Law Examiners, Defendants–Appellants.

### No. 97–9162.

United States Court of Appeals, Second Circuit.

Argued June 2, 1998.

Decided Sept. 14, 1998.

John W. McConnell, Deputy Solicitor General, State of New York, New York City (Dennis C. Vacco, Attorney General of the State of New York, Thomas D. Hughes, Assistant Solicitor General, Judith T. Kramer, Rebecca Ann Durden, Assistant Attorneys General, State of New York, New York City, of counsel), for Appellants.

Jo Anne Simon, Brooklyn, NY (Dorothy A. Wendel, Law Office of Jo Anne Simon, Brooklyn, NY, Ruth Lowenkron, Karen Fisher Gutheil, New York Lawyers for the Public Interest, Inc., New York City, of counsel), for Appellee.

Bill Lann Lee, Acting Assistant Attorney General, Jessica Dunsay Silver, Marie K. McElderry, Department of Justice, Washington, DC, for Amicus Curiae United States.

John S. Willems, White & Case, New York City, Kleo J. King, Mary Lu Bilek, Association of the Bar of the City of New York, New York City, for Amicus Curiae Association of the Bar of the City of New York.

Robert A. Burgoyne, Fulbright & Jaworski, Washington, DC, Erica Moeser, National Conference of Bar Examiners, Chicago, IL, for Amicus Curiae National Conference of Bar Examiners.

Janet D. Carson, National Board of Medical Examiners, Philadelphia, PA, Pamela C. Deem, Carey, Hill & Scott, Charleston, WV, for Amici Curiae National Board of Medical Examiners and Federation of State Medical Boards of the United States, Inc.

David McMillin, Linda R. Blumkin, Elise C. Boddie, Sherab Posel, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Amici Curiae The Ass'n on Higher Education and Disability, Disability Rights Advocates, Disability Rights Education and Defense Fund, Inc., The Int'l Dyslexia Ass'n, The Learning Disabilities Ass'n of America, The Nat'l Ass'n of Protection and Advocacy Systems, The Nat'l Center of Higher Education for Learning Problems Program, The New York Branch of the Orton Dyslexia Society, The New York State Commission on the Quality of Care for the Mentally Disabled, The Society of American Law Teachers, and United Cerebral Palsy Associations of New York State, Inc.

Before: MESKILL and CABRANES, Circuit Judges, and NICKERSON,* District Judge.

MESKILL, Circuit Judge:

This is an appeal from a July 14, 1997 judgment of the United States District Court for the Southern District of New York, Sotomayor, *J.*, after a 21 day bench trial, finding appellee, Dr. Marilyn Bartlett, disabled within the meaning of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 701, *et seq.*, and entering an injunction against the appellant, New York State Board of Law Examiners (Board) requiring it to provide Dr. Bartlett with reasonable accommodations in taking the New York State Bar Examination. The district court also awarded $12,500 in damages to compensate her for fees paid in connection with past attempts to pass that examination. *See Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094 (S.D.N.Y.1997). The district court granted qualified immunity to the individual defendants. That decision has not been appealed.

We affirm in part, vacate in part and remand for further proceedings. We agree,

* Honorable Eugene H. Nickerson, United States District Judge for the Eastern District of New York, sitting by designation.

albeit for different reasons, with the district court's ultimate conclusion that Dr. Bartlett, who has fought an uphill battle with a reading disorder throughout her education, is among those for whom Congress provided protection under the ADA and the Rehabilitation Act. As a result, she is entitled to reasonable accommodations in sitting for the New York bar examination. The ADA and the Rehabilitation Act do not guarantee Dr. Bartlett examination conditions that will enable her to *pass* the bar examination—that she must achieve on her own. What Congress did provide for, and what the Board has previously denied her, is the opportunity to *take* the examination on a level playing field with other applicants.

Specifically, this appeal presents the legal issues of (1) whether the district court erred in refusing to defer to the Board's determination that Dr. Bartlett is not disabled; (2) whether the district court erred in concluding that Dr. Bartlett is disabled under the ADA and the Rehabilitation Act in her ability to work and thus entitled to accommodations in taking the New York State Bar Examination; (3) whether the district court erred in concluding that the Board is subject to the strictures of the Rehabilitation Act; and (4) whether the district court erred in awarding Dr. Bartlett compensatory damages in the amount of $12,500 from the Board for fees paid in connection with the five bar examinations that she failed.

We conclude that the district court properly declined to defer to the Board's determination regarding Dr. Bartlett's disability. We also conclude that because the record demonstrates that Dr. Bartlett suffers from a disability that substantially limits her major life activities of reading and learning, it was error for the district court to reach the issue of whether Dr. Bartlett is disabled in her ability to work. However, because Dr. Bartlett nevertheless does suffer a learning or reading impairment that rises to the level of a substantial limitation cognizable under the ADA and the Rehabilitation Act, we find no error

in the district court's ultimate conclusion that Dr. Bartlett is entitled to reasonable accommodations in taking the New York State Bar Examination. We also agree with the district court that the Board is subject to the strictures of the Rehabilitation Act and that Dr. Bartlett is entitled to compensation for at least some of the fees paid in connection with past attempts to pass the New York State Bar Examination without accommodations. Because we disagree with the district court on the proper amount of compensatory damages, we vacate and remand on that narrow ground only.

## BACKGROUND

At trial, the district court found the following relevant facts. Plaintiff-appellee Dr. Marilyn Bartlett is a 49 year old woman with a cognitive disorder that impairs her ability to read. Despite her limitation, she has earned a Ph.D. in Educational Administration from New York University, a law degree from Vermont Law School, and has met all prerequisites to sit for the New York State Bar Examination (the bar examination). The defendant-appellant Board is a State entity charged with testing and licensing applicants seeking admission to the New York State Bar.

Since 1991, Dr. Bartlett has taken the bar examination five times. On at least three and possibly four separate occasions, she has applied as a reading disabled candidate to take the bar examination with accommodations.[1] Dr. Bartlett has sought unlimited or extended time to take the test, permission to tape record her essays and to circle her multiple choice answers in the test booklet. The Board has denied her request each time, contending that her application does not support a diagnosis of a reading disability or dyslexia. In total, Dr. Bartlett has taken the examination four times without accommodations and has yet to pass. On July 20, 1993, after the Board denied her most recent application for accommodations, she commenced

---

1. She requested accommodations for the July 1991, February 1993 and July 1993 examinations. Dr. Bartlett did not seek accommodations for the February 1992 bar examination and the record is unclear as to whether she sought ac-

commodations for the July 1992 exam. With respect to the July 1992 exam, the district court found that "[Dr. Bartlett] claims she [applied for accommodations], but the Board has no record of the request." *Bartlett*, 970 F.Supp. at 1102.

this action in the district court alleging, among other things, violations of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. In her complaint, she sought, among other things, injunctive relief in the form of reasonable testing accommodations and compensatory damages for fees paid in connection with past attempts to pass the examination.

On July 26, 1993, the parties entered into a stipulation. Under its terms, Dr. Bartlett received accommodations during the July 1993 bar examination that included time-and-a-half for the New York portion of the test and the use of an amanuensis to read the test questions and to record her responses. In addition, the Board allowed Dr. Bartlett to mark the answers to the multiple choice portion of the examination in a question book rather than on a computerized answer sheet. However, the parties agreed that if Dr. Bartlett passed the examination, the results would not be certified unless she prevailed in this lawsuit. Despite accommodations, Dr. Bartlett failed the examination.

The Board has denied Dr. Bartlett's requested accommodations because its expert on learning disabilities, Dr. Frank Vellutino (Dr. Vellutino), does not believe that she has dyslexia or a reading disability. Dr. Vellutino's opinion is grounded primarily on Dr. Bartlett's performance on two subtests of the Woodcock Reading Mastery Test–Revised (the Woodcock), a battery of tests commonly employed to assess learning disabilities. Because Dr. Bartlett achieved scores above the 30th percentile on two subtests of that battery, Dr. Vellutino concluded that she did not have a reading disability.

The two subtests at issue are the Woodcock "Word Attack" and "Word Identification." These tests are designed to measure a subject's " '[w]ord identification and phonetic decoding or word analysis skills (ability to "sound out" a word).' " *Bartlett*, 970 F.Supp. at 1112. Specifically, the "Word Attack" subtest requires the subject to sound out 45 nonsense words of varying complexity. The "Word Identification" subtest, on the other hand, measures a subject's ability to identify 106 real words in isolation that range from a

simple "is" to the more difficult "zymolysis." Both tests are untimed and the scores do not reflect incorrect tries that precede a correct answer. Because "the incidence of learning disabilit[ies] in the population is estimated at between 5% and 20%," *see id.*, Dr. Vellutino estimates that a 30% cutoff is reasonably certain to capture all disabled applicants. Accordingly, he recommended against providing accommodations to any applicant, including Dr. Bartlett, who performs above the 30th percentile.

At trial, Dr. Bartlett challenged Dr. Vellutino's opinion. She presented expert testimony and other evidence to the effect that her reading disability could not be measured solely by the Woodcock. On July 7, 1997, the court issued its opinion and order. After a thorough and painstaking discussion of Dr. Bartlett's evidence, the district court found fatal infirmities in Dr. Vellutino's reliance on the Woodcock and the Board's subsequent rejection of Dr. Bartlett's claim of disability. Specifically, the court found (a) the Woodcock could not measure Dr. Bartlett's lack of "automaticity," *i.e.*, her ability to recognize a printed word and read it accurately and immediately without thinking; (b) the Woodcock was not timed and thus could not measure the slowness of reading—an important characteristic of adult dyslexics like Dr. Bartlett, who, on other tests, had demonstrated a reading rate comparable to the bottom fourth percentile of college freshman when timed; (c) the Woodcock was designed principally to assess children and did not have enough items in the difficult range; and (d) Dr. Bartlett's Woodcock results exhibited discrepancies, revealing high reading comprehension scores in comparison to low, but average, Word Attack and Word Identification scores. *See id.* at 1114. Furthermore, the district court found that Dr. Vellutino's use of a 30th percentile cutoff was arbitrary and flawed because other studies demonstrated that one third of adults with dyslexia scored above that percentile on similar tests. *See id.*

In sum, the district court agreed with Dr. Bartlett's experts that "a reading disability is not quantifiable merely in test scores.... [Rather] diagnosing a learning disability re-

quires clinical judgment." *Id.* In this regard, the district court found that Dr. Bartlett's low "test scores on the Woodcock, combined with clinical observations of her [slow and halting] manner of reading amply support a conclusion that she has an automaticity and a reading rate problem." *Id; see also id.* at 1107. Moreover, the court agreed with Dr. Bartlett's experts that her "earlier work as a school teacher where phonics were stressed allowed [her] to develop 'self-accommodations' that account for her ability to spell better and to perform better on word identity and word attack tests than would be expected of a reading disabled person." *Id.* at 1109; *see also id.* at 1120.

The district court, however, did not find that Dr. Bartlett is substantially limited in the major life activities of reading or learning, reasoning that her "history of self-accommodation has allowed her to achieve ... roughly average reading skills (on some measures) when compared to the general population." *Id.* at 1120. Rather, the court, relying on regulations promulgated under Title I of the ADA, held that Dr. Bartlett is disabled in her ability to "work" because her reading rate compared unfavorably with "persons of 'comparable training, skills and abilities.'" *Id.* at 1121. Specifically, the court concluded that Dr. Bartlett's inability to compete on the bar examination constituted a work disability, stating:

> If plaintiff's disability prevents her from competing on a level playing field with other bar examination applicants, then her disability has implicated the major life activity of working because if she is not given a chance to compete fairly on what is essentially an employment test, she is necessarily precluded from potential employment in that field. In this sense, the bar examination clearly implicates the major life activity of working.

*Id.* The court then concluded, *inter alia,* that Dr. Bartlett is disabled within the meaning of the ADA and § 504 of the Rehabilitation Act, *id.* at 1126, and that the Board's failure to accommodate her constituted violations of those statutes.

As a remedy for the violations found, the court ordered injunctive relief in the form of reasonable testing accommodations including double time in taking the examination, the use of a computer, permission to circle multiple choice answers in the examination booklet, and large print on both the New York State and Multistate Bar Exam. *Id.* at 1153. The court also awarded compensatory damages in the amount of $12,500 for fees paid in connection with the five bar examinations that Dr. Bartlett failed. *Id.* at 1152.

On July 14, 1997, the Board moved for relief from the judgment, or in the alternative to amend it, pursuant to Fed.R.Civ.P. 59(e) and 60(b). By memorandum of decision dated August 15, 1997, the district court denied that motion. *See Bartlett v. New York State Bd. of Law Examiners,* 2 F.Supp.2d 388 (S.D.N.Y.1997). On September 10, 1997, the Board filed its notice of appeal.

## DISCUSSION

On appeal, the Board claims that the district court (1) erred in refusing to defer to its determination that Dr. Bartlett is not disabled; (2) erred in concluding that Dr. Bartlett is disabled in her ability to work and thus entitled to accommodations in taking the bar examination; (3) erred in concluding that the Board is subject to the strictures of the Rehabilitation Act; and (4) erred in awarding compensatory damages in the amount of $12,500 for fees paid in connection with each of the five bar examinations that Dr. Bartlett failed.

■ After a bench trial, we review a district court's factual findings for clear error and its conclusions of law *de novo. See Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 780 (2d Cir.1991). So-called mixed questions of law and fact are reviewed *de novo. Travellers Int'l, A.G. v. Trans World Airlines,* 41 F.3d 1570, 1575 (2d Cir.1994); *see also Muller v. Committee on Special Educ. of the East Islip Union Free School Dist.,* 145 F.3d 95, 102 (2d Cir.1998) (*de novo* review governed where statutory and regulatory definitions were applied to facts surrounding plaintiff's medical and educational history).

### 1. *Deference to the Board*

■ The Board first argues that the district court erred in refusing to accord "considerable judicial deference" to its factual finding that Dr. Bartlett is not disabled. Specifically, the Board asserts that our decision in *Doe v. New York Univ.*, 666 F.2d 761, 775–76 (2d Cir.1981), requires federal courts to defer to the findings of a state administrative agency when the agency's findings are supported by expert opinion. We disagree.

■ A federal court may, in its discretion, defer to the findings of a state administrative agency. *See Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (quoting *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)). "There is no generally accepted rule to determine the degree of deference that [should be accorded] to the factual determinations of state and local administrative agencies." *New York State Ass'n for Retarded Children v. Carey*, 612 F.2d 644, 648 (2d Cir.1979). When deference is due, however, it is not because of the factfinder's status as a state agency, but because of the factfinder's inherent expertise on "technical matters foreign to the experience of most courts." *Id.* at 650; *see also Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (citing *Bell v. Wolfish*, 441 U.S. 520, 544, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and its observation that "[c]ourts should not second-guess the expert administrators on matters on which they are better informed.") (internal quotation marks omitted). Thus, in *Doe*, we deferred to the findings of an academic institution on issues relating to academic qualifications required for admission to an institution of higher education, because "[c]ourts are particularly ill-equipped to evaluate academic performance." *Id.* at 776 (citation and internal quotation marks omitted). We did not, as the Board would have it, announce a rule of law that deference should be accorded once a state agency's factfinding is supported by expert opinion regardless of the agency's particular expertise. Moreover, even where an agency has expertise, courts should not allow agency factual determinations to go unchallenged, *see Carey*, 612 F.2d at 648, and deference is particularly "inappropriate once that agency is the defendant in a discrimination suit." *Id.* at 649.

Applying these principles to the instant case, the district court properly refused to defer to the Board. The Board has no expertise in assessing learning disabilities. Rather, the Board's expertise is in defining the minimum qualifications necessary to practice law in New York. Accordingly, both reason and the law militate against giving deference to the Board's findings regarding disability, especially where, as here, the Board is defending against charges of illegal discrimination.

### 2. *Disability*

■ The central issue on appeal is whether Dr. Bartlett is disabled within the meaning of the ADA and the Rehabilitation Act and thus entitled to reasonable accommodations in taking the bar examination. We conclude that she is disabled, but for reasons other than those articulated by the district court.

An individual is disabled within the meaning of the ADA and § 504 of the Rehabilitation Act if, *inter alia*, that individual suffers "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A)(ADA); *see also* 29 U.S.C. § 706(8)(B) (Rehabilitation Act). "The ADA does not define [the] ... phrases above that are critical to understanding the nature of an ADA disability: 'physical or mental impairment,' ['major life activities' and 'substantially limits']." *See Price v. National Bd. of Medical Examiners*, 966 F.Supp. 419, 424 (S.D.W.Va.1997). However, Congress authorized the Equal Employment Opportunities Commission (EEOC) to issue regulations defining workplace discrimination under Title I of the ADA. *See* 42 U.S.C. § 12116. The Attorney General (Department of Justice), on the other hand, was authorized to issue regulations addressing discrimination in both public and private service organizations under Titles II and III of the ADA. *See* 42

U.S.C. § 12134(a) (Title II, Subtitle A), and 42 U.S.C. § 12186(b) (Title III).[2]

Dr. Bartlett commenced this action under, *inter alia*, Title II of the ADA against the Board, a public licensing entity. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(6). She claimed to suffer a physical or mental impairment that substantially limited her major life activities of learning (or reading)[3] and working. Regulations promulgated by the Justice Department under Title II of the ADA define a "physical or mental impairment" as "[a]ny mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and *specific learning disabilities.*" 28 C.F.R. § 35.104 (at *Disability* (1)(i)(B)) (emphasis added). These same regulations define "major life activities" as "functions such as ... walking, seeing, hearing, speaking, breathing, *learning,* and *working.*" 28 C.F.R. § 35.104 (at *Disability* (2)) (emphasis added). Title II regulations do not define the phrase "substantially limits." However, the Justice Department's Title II interpretive guidance states that "Title II ... incorporates those provisions of titles I and III of the ADA that are not inconsistent with the regulations implementing [the Rehabilitation Act]." *See* 28 C.F.R. § 35.103, App. A. We therefore turn to Titles I and III for the definition of "substantially limits."

Under Title I, "substantially limits" is defined as "[s]ignificantly restrict[s] as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the *average person in the general population* can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added). This definition is consistent with the Justice Department's Title II and III interpretive guidance. *See* 28 C.F.R. §§ 35.104 App. A at 470, 36.104 App. B at 611 (measuring the restriction of major life activities "in compar-

ison to most people"). However, for the specific major life activity of "working," Title I regulations define "substantially limits" as

significantly restrict[s] ... the ability to perform either a class of jobs or a broad range of jobs in various classes as *compared to the average person having comparable training, skills and abilities.* The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added).

In its opinion and order, the district court concluded that Dr. Bartlett is not "substantially limited" in her major life activities of reading or learning, reasoning that her "history of self-accommodation has allowed her to achieve ... roughly average reading skills (on some measures) when *compared to the general population.*" *Bartlett,* 970 F.Supp. at 1120 (emphasis added). However, in the district court's view, the bar examination implicates the major life activity of working because "if [Dr. Bartlett] is not given a chance to compete fairly on what is essentially an employment test, she is necessarily precluded from potential employment in that field." *Id.* at 1121. In turn, the Title I "working" rubric provides for a comparison with a more narrow reference group—the population having "comparable training, skills and abilities," 29 C.F.R. § 1630.2(j)(3)(i)—in determining whether a limitation is substantial. Invoking that standard, the district court concluded that Dr. Bartlett is disabled within the meaning of the ADA because her "reading ability" compared unfavorably with people of "[comparable] educational achievement," that is, with persons of "[comparable] background, skills, and abilities." *Id.* at 1126.

On appeal, the lion's share of the arguments center on whether the district court properly concluded that the bar examination implicates the major life activity of working, and whether it was appropriate for the dis-

---

**2.** Congress also authorized the Secretary of Transportation to issue regulations not relevant here. *See* 42 U.S.C. §§ 12149, 12164 and 12186(a).

**3.** *See Bartlett,* 970 F.Supp. at 1117 ("The experts who testified at trial agreed that reading is the

major life activity most commonly affected by learning disabilities.... Clearly, reading is a major life activity, as other courts have found.") (citing *Pridemore v. Rural Legal Aid Society,* 625 F.Supp. 1180, 1183–84 (S.D.Ohio 1985)).

trict court to employ the Title I comparative standard for determining a working disability in this Title II case. Because we believe, however, that the district court erred in its threshold holding that Dr. Bartlett is not substantially limited in her major life activity of reading or learning as compared to the manner and condition under which the average person can read or learn, we do not reach the issue of whether Dr. Bartlett is disabled in her major life activity of working or the extent to which the Title I standard for assessing a working disability may apply. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

As we have discussed, the district court concluded that Dr. Bartlett was not substantially limited in reading or learning, and hence not disabled within the meaning of the ADA or § 504 of the Rehabilitation Act, because her "history of self-accommodation has allowed her to achieve ... roughly average reading skills (on some measures) when compared to the general population." *Bartlett*, 970 F.Supp. at 1120. Dr. Bartlett, joined by the Justice Department as *amicus curiae*, claim error in this aspect of the court's reasoning. Specifically, both Dr. Bartlett and the Justice Department assert that a person's ability to self-accommodate does not foreclose a finding of disability. We agree.

"[A] disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids." H.R.Rep. No. 101–485(II), at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 334. In *Doane v. City of Omaha*, 115 F.3d 624 (8th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998), the Eighth Circuit held that a police officer, blinded in one eye, was disabled within the meaning of the ADA notwithstanding his development of self-accommodations or "subconscious adjustments" enabling him to compensate for the limitation. *Id.* at 627. In this regard, the court stated: "[The plaintiff's] brain has mitigated the effects of his impairment, but our analysis of whether he is disabled does not include consideration of

mitigating measures. His personal, subconscious adjustments to the impairment do not take him outside of the protective provisions of the ADA." *Id.* at 627–28; *see also Wilson v. Pennsylvania State Police Dep't*, 964 F.Supp. 898, 907 (E.D.Pa.1997) (concluding that plaintiff is entitled to proceed to trial based on disability despite use of glasses to correct vision); *cf. Stillwell v. Kansas City, Mo. Bd. of Police Comm'rs*, 872 F.Supp. 682, 685 (W.D.Mo.1995) (concluding that self-accommodating plaintiff is disabled under Title II). In this case, Dr. Bartlett suffers from a lack of automaticity and a phonological processing defect that significantly restricts her ability to identify timely and decode the written word, that is, to read as compared to the manner and conditions under which the average person in the general population can read or learn. Her history of self-accommodations, while allowing her to achieve roughly average reading skills (on some measures) when compared to the general population, "do not take [her] outside of the protective provisions of the ADA," *Doane*, 115 F.3d at 627–28, especially where, as here, the dispositive measure is the Woodcock, a test that allowed her unlimited time to compensate for her disability, and a test that cannot measure automaticity directly. Hence, we agree that Dr. Bartlett is disabled within the meaning of Title II of the ADA and § 504 of the Rehabilitation Act and is entitled to reasonable accommodations in taking the bar examination.

### 3. *The Rehabilitation Act*

■ Although it is undisputed that the Board is subject to the ADA—an adequate independent ground for our finding of liability above—the Board contests the district court's conclusion that liability may also be premised on the Rehabilitation Act, because it contends that it is not an entity subject to that statute. The district court found that because the Board has "*elect[ed]* to accept [federal] money, ... the Board ... consented to ... the burdens of Section 504 [of the Rehabilitation Act]." *Bartlett*, 970 F.Supp. at 1118 (emphasis added). The Board argues that the district court's finding is clearly erroneous because (a) the record contains no evidence that the Board receives federal funds; (b) the Board has no authority to

accept or decline federal funds received by other state agencies; and (c) the Board's operation costs are in no way subsidized by federal funds.

Dr. Bartlett responds that because the Board "receives" federal funds from two New York agencies, the Board is bound by the Rehabilitation Act. Specifically, the New York State Department of Education, Office of Vocational and Educational Services for Individuals with Disabilities (VESID) and the New York State Department of Social Services, Commission for the Blind and Visually Handicapped (CBVH) receive federal funds and issue vouchers for handicapped bar applicants to pay for the bar examination. The individual bar applicants submit the vouchers to the Board which in turn submits them to the VESID and the CBVH for payment. Thus, Dr. Bartlett maintains that the Board is a recipient of federal funds within the meaning of § 504. We agree.

Section 504 of the Rehabilitation Act prohibits discrimination against persons with disabilities by "any *program or activity receiving* Federal financial assistance." 29 U.S.C. § 794(a). "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the *recipient's agreement* to accept the federal funds." *United States Dep't of Transp. v. Paralyzed Veterans,* 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) (emphasis added). Thus, section 504 obligations may be imposed only on "those who are *in a position to accept or reject those obligations* as a part of the decision whether or not to 'receive' federal funds." *Paralyzed Veterans,* 477 U.S. at 606, 106 S.Ct. 2705 (emphasis added). There is neither a requirement that a state entity *directly* receive federal financial assistance, *see Grove City College v. Bell,* 465 U.S. 555, 564, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), nor that it directly benefit from that assistance, *see Paralyzed Veterans,* 477 U.S. at 607, 106 S.Ct. 2705 (citing *Grove City* ).

Shortly after the Supreme Court's decisions in *Grove City* and *Paralyzed Veterans,* Congress amended the Rehabilitation Act to extend § 504 liability to departmental or agency affiliates and transferees. *See* Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, § 4, 102 Stat. 28, 29 (1988) (codified at 29 U.S.C. § 794) (1988 Amendments). Under the 1988 Amendments, the definition of "program or activity" was expanded to include not only a state or local entity originally receiving such assistance, but also each department or agency to which it "extend[s]" that assistance. 29 U.S.C. § 794(b)(1)(B) (emphasis added). Similarly, regulations promulgated under the Rehabilitation Act define a "recipient" as including "any instrumentality of a state ... to which Federal financial assistance is extended directly *or through another recipient.*" 45 C.F.R. § 84.3(f) (emphasis added). Neither the statute nor the regulations require an analysis of whether the instrumentality of a state to which the assistance is "extended," must also be in a position to accept or reject § 504 obligations for the strictures of the Rehabilitation Act to apply.

Therefore, although there is nothing in the record to indicate that the Board ever actually elected to accept federal funds, the lack of such evidence is immaterial. Likewise, it is not relevant whether the Board directly receives federal assistance or benefits from such assistance by way of subsidy. The Board is bound by the Rehabilitation Act simply because two state entities, VESID and the CBVH, elected to receive federal funds and then extended that assistance to the Board in the form of vouchers for handicapped bar applicants. Accordingly, the district court's conclusion that the Board is subject to § 504 is correct.

### 4. Compensatory Damages

#### a. Compensatory Damages and the Rehabilitation Act

■ The Board next argues that the district court erred in awarding Dr. Bartlett compensatory damages. Specifically, the Board asserts that while compensatory damages are available under the ADA and the Rehabilitation Act, Dr. Bartlett is not entitled to them because she failed to prove intentional discrimination. In this regard, the Board argues that the district court con-

ceded the lack of discriminatory intent by finding, in the context of its qualified immunity analysis, that the Board's denial of accommodations was "objectively reasonable" and that "[d]efendants seemingly made an attempt to comply with the statutes." *Bartlett,* 970 F.Supp. at 1146.

We conclude that Dr. Bartlett met her burden of proving discriminatory intent within the meaning of the ADA and the Rehabilitation Act. Accordingly, we find no error in the conclusion of the district court that she is entitled to compensatory damages. A plaintiff aggrieved by a violation of the ADA or the Rehabilitation Act may seek Title VI remedies. *See* 29 U.S.C. § 794a(a)(2); *see also* 42 U.S.C. § 12133 (ADA, looking to remedies provided under the Rehabilitation Act); *Bartlett,* 970 F.Supp. at 1147 n. 39. The law is well settled that intentional violations of Title VI, and thus the ADA and the Rehabilitation Act, can call for an award of money damages. *See Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 74, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (in the context of Title IX cases, compensatory damages are available for an intentional violation); *Pandazides v. Virginia Bd. of Education,* 13 F.3d 823, 830 (4th Cir.1994) (because of the similarity between Title IX and § 504 of the Rehabilitation Act, compensatory damages are available for intentional discrimination); *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 789 (6th Cir.1996) ("Every circuit that has reached the issue after *Franklin* has held that compensatory damages are available under [the Rehabilitation Act].").

■ In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will. *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1406 (10th Cir.1997) (citing *Oxford House-C v. City of St. Louis,* 843 F.Supp. 1556, 1577 (E.D.Mo.1994)). Rather, intentional discrimination may be inferred when a "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy ... [or] custom." *Ferguson v. City of Phoenix,* 931 F.Supp. 688, 697 (D.Ariz.1996), aff'd and remanded, 1998

WL556520 (9th Cir. Sept. 3, 1998) (internal quotation marks and citations omitted) (first alteration in original); *see also Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In this case, the Board implemented a policy of denying accommodations to any learning disabled bar applicant who achieved scores above the 30th percentile on the Woodcock Word Attack and Word Identification tests. As the evidence showed at trial, however, one third of adults *with dyslexia* scored above that percentile on similar tests. Moreover, the Woodcock, unlike the bar examination, is untimed. Consequently, the Woodcock is unreliable in measuring a disability commonly manifested in part by a deficient reading rate. Nevertheless, based on that measure, the Board repeatedly denied Dr. Bartlett's requests for accommodations. We conclude that implementing such a policy constituted deliberate indifference to a strong likelihood of violating Dr. Bartlett's federally protected rights. Consequently, we conclude that Dr. Bartlett has met her burden of demonstrating entitlement to compensatory damages.

### b. *The $12,500 Award*

■ The Board next argues that the district court erred in concluding that Dr. Bartlett is entitled to $12,500 in compensatory damages, representing $2,500 in fees paid for each of five bar examinations she took without accommodations she requested. Specifically, the Board argues the sum is erroneous because Dr. Bartlett (a) did not timely apply for accommodations in taking the June 1991 bar examination; (b) did not seek accommodations for the February 1992 bar examination; (c) submitted no evidence in support of her contention that she sought accommodations for the July 1992 bar examination; and (d) received accommodations on the July 1993 bar examination but nevertheless failed. We agree in part.

■ We review the method of calculation of damages *de novo, see Wolff & Munier v. Whiting-Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir.1991), and the actual calculation of damages for clear error, *see United States Naval Inst. v. Charter Communica-*

*tions,* 936 F.2d 692, 697–98 (2d Cir.1991). In holding the Board liable for Dr. Bartlett's bar examination expenses, the district court stated: "What is clear is that [Dr. Bartlett's] taking of the bar examination without the accommodations to which she was entitled under the law was a waste of her time and money. For the losses, [Dr. Bartlett] should be reimbursed." *Bartlett,* 970 F.Supp. at 1152. The court then awarded Dr. Bartlett compensatory damages for each of the five bar examinations she took. The court did not examine whether, for each bar examination, there was a denial of accommodations due to illegal discrimination. This was error as a matter of law. *See Atkins v. New York City,* 143 F.3d 100, 103 (2d Cir.1998) ("To recover compensatory damages plaintiff must prove that his injuries were proximately caused by [illegal discrimination.]"). We therefore conclude that the Board must compensate Dr. Bartlett only for bar examination expenses incurred where the Board denied accommodations because of illegal discrimination. Thus, because Dr. Bartlett did not seek accommodations for the February 1992 bar examination, the Board is not liable for damages arising from its failure to accommodate. By contrast, the Board illegally denied Dr. Bartlett's timely request for accommodations in taking the February 1993 bar examination and, therefore, is liable for Dr. Bartlett's expenses incurred in connection with that examination. We cannot reach a conclusion on the award for the remaining three bar examinations because of the inadequacy of the district court's findings. Accordingly, we remand for findings of fact and a new damages calculation.

## CONCLUSION

For reasons other than those articulated by the district court, we affirm the judgment that Dr. Bartlett is disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act and thus was and is entitled to reasonable accommodations in taking the New York Bar Examination. Dr. Bartlett's cognitive impairment—her difficul-

ties in automatically decoding and processing the printed word—limits her major life activities of learning and reading to a substantial degree. Reasonable accommodation of this disability will enable her to compete fairly with others in taking the examination, so that it will be her mastery of the legal skills and knowledge that the exam is designed to test—and not her disability—that determines whether or not she achieves a passing score. We vacate and remand for findings of fact and recalculation of compensatory damages due Dr. Bartlett in accordance with this decision.

Costs to the appellee.