32    *Gonzales v. National Board*
*of Medical Examiners*                    No. 99-1931

IV.

I must confess that before delving into this case, I would have been skeptical that a person with a reading disability as serious as the one Gonzales insists he has would be able to survive the rigors of medical school and be capable of practicing medicine successfully afterward. Nevertheless, Gonzales has apparently satisfied the faculty of one of this country's preeminent medical schools that he would make a very good physician, and I have little doubt that the faculty of the University of Michigan Medical School are better judges than I of who ought to be allowed to practice medicine.

For the reasons set forth above, I believe that the district court's finding that Gonzales does not have a disability within the meaning of the ADA is not supported by the record as it presently exists. The only finding consistent with Gonzales's testimony and the conclusions of the two experts who have met with and examined him is that he has a rather severe reading disability. Although the district court was obviously not required to credit Gonzales's testimony or that of Dr. Giordani, the district court's decision to credit the testimony of Drs. Flanagan and Litchford (particularly Dr. Flanagan) seems to me irreconcilable with the district court's recognition of Dr. Giordani as a "competent and accomplished psychologist." *Gonzale[s] v. Nat'l Bd. of Medical Examiners*, 60 F. Supp. 2d 703, 708 (E.D. Mich. 1999).

I would therefore vacate the order of the district court and remand this case for further proceedings. The district court could allow supplemental briefing or, in the exercise of its discretion, the taking of additional evidence on the subject of whether Gonzales is likely to succeed on the merits, and then, if necessary, address the other factors that are relevant in determining whether injunctive relief should be granted.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0277P (6th Cir.)
File Name: 00a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL GONZALES,
        *Plaintiff-Appellant,*

        *v.*                                    No. 99-1931

NATIONAL BOARD OF
MEDICAL EXAMINERS,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72190—Lawrence P. Zatkoff, Chief District Judge.

Argued: January 25, 2000

Decided and Filed: August 22, 2000

Before: NELSON, SUHRHEINRICH, and GILMAN,
Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard J. Landau, DYKEMA GOSSETT, Ann Arbor, Michigan, for Appellant. Roy C. Hayes, III, HAYES LAW FIRM, Charlevoix, Michigan, for Appellee. **ON BRIEF:** Richard J. Landau, DYKEMA GOSSETT, Ann Arbor, Michigan, for Appellant. Roy C. Hayes, Roy C.

Hayes, III, HAYES LAW FIRM, Charlevoix, Michigan, for Appellee.

SUHRHEINRICH, J., delivered the opinion of the court, in which NELSON, J., joined.  GILMAN, J. (pp. 23-32), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

SUHRHEINRICH, Circuit Judge.   Plaintiff Michael Gonzales ("Gonzales" or "Plaintiff") appeals the district court's denial of his request for preliminary injunctive relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* ("ADA").  Plaintiff requested that Defendant National Board of Medical Examiners ("NBME" or "Defendant") be ordered to allow him extended time to take the United States Medical Licensing Examination Step 1 ("Step 1 Examination") because of an alleged disability.

### I.  BACKGROUND

In 1998, after successfully completing two years of medical school at the University of Michigan Medical School ("UMMS"), Gonzales applied to take the Step 1 Examination a prerequisite to proceeding with the third year of medical school.  The Step 1 Examination is the first of three United States Medical Licensing Examinations ("USMLE") required for medical licensure in all states.  The NBME administers the USMLE.

Before taking the Step 1 Examination on June 9-10, 1998, Gonzales asserted a learning disability and requested the NBME to allow him extended time, one and a half times the standard time, on the examination.  He supported his request for test accommodations (which was endorsed by UMMS) with a psychological evaluation which Gordon L. Ulrey

There might well have been other reasons why Gonzales was not likely to succeed on the merits.  Indeed, there might have been reasons weighing against granting injunctive relief even if Gonzales had established a likelihood of success on the merits.  But the district court's decision to deny injunctive relief was based on its finding that Gonzales did not have any disability within the meaning of the ADA (and thus had no chance of success on the merits), and that finding, on the basis of the record before us, appears to me to have been clearly erroneous.

### III.

I also disagree with the majority's statement that Gonzales does not "fit within Congress's vision of the disabled population." Maj. Op. at 15.  Although it is indisputable that "[p]ersons with minor trivial impairments, such as a simple infected finger are not impaired in a major life activity," Maj. Op. at 19, I do not understand how the reading impairment described by Gonzales and Dr. Giordani can reasonably be compared to an infected finger.

Finally, I disagree with the majority's assertion that recognizing serious reading impairments of the sort described by Gonzales as "disabilities" would stretch the ADA well beyond its intended purpose.  Congress anticipated that its definition of "an individual with a disability" would apply to "some 43,000,000 Americans."  42 U.S.C. § 12101(a)(1). Forty-three million is too small a number to include all of the people in the United States who require eyeglasses or contact lenses to see normally, *see Sutton*, 527 U.S. at 487 (observing that counting persons who can see normally with corrective lenses as "disabled" would drive the total of "disabled" persons well over one hundred million, a far greater number than Congress intended be covered by the ADA), but forty-three million is still a very large number—larger, I think, than the majority is willing to recognize.

testimony (as well as that of Dr. Giordani) to the effect that Gonzales is a member of the minority of individuals with strong cognitive ability but with very weak reading ability.

Furthermore, Dr. Litchford's testimony did little to support the NBME's claim that Gonzales does not have a learning disability. Rather, Dr. Litchford testified that the results of the tests administered by Dr. Giordani supported a finding of a writing disorder—although he doubted that having a writing disorder would hinder one's performance on the Step 1 exam. Dr. Litchford nevertheless forthrightly conceded that neither he nor the NBME had ever conducted any sort of empirical study to determine whether writing disabilities have any effect on how one performs on the NBME's examinations.

The question of whether a certain form of accommodation (i.e., more testing time) is required or appropriate for a given disability is a question entirely separate from whether the individual has a "disability" in the first place. *See Shepler v. Northwest Ohio Developmental Ctr.*, No. 99-3079, 2000 WL 191496, at *7 (6th Cir. Feb. 9, 2000) (unpublished) (Gilman, J., dissenting) (observing that the question of whether the plaintiff in an ADA case has a disability should be kept analytically separate from other questions, such as whether certain proposed accommodations are required by the ADA); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 508 (7th Cir. 1998) (same); Matthew Diller, *Judicial Backlash, the ADA, and the Civil Rights Model*, 21 BERKELEY J. EMP. & LAB. L. 19, 21–29, 49 (2000) (criticizing judicial opinions that deny relief under the ADA after bending over backwards to find plaintiffs not covered by the statute) ("After all, a finding that a person is protected by the ADA only leads to the central question of whether the [defendant] has improperly discriminated against the individual."). In view of the concession by Dr. Litchford (whose testimony the district court credited) that the results of the tests administered by Dr. Giordani supported a finding of a writing disorder, the district court's conclusion that Gonzales did not have any disability for the purposes of the ADA appears untenable.

("Ulrey"), Ph.D.,[1] prepared in 1994 when Gonzales was an undergraduate student at the University of California at Davis ("UCD").

In 1994, Ulrey interviewed Gonzales and reported that Gonzales's main concern was low scores on multiple-choice tests, especially the Medical College Aptitude Test ("MCAT"). In addition to the interview, Ulrey based his evaluation of Gonzales on a battery of tests: 1) Wechsler Adult Intelligence Scale - Revised; 2) Wide Range Achieve Test - Revised, Level II; 3) Learning Efficiency Test, 2nd Edition; 4) Nelson-Denny Reading Test, Form E. Ulrey diagnosed Gonzales as having a learning disability.[2] Ulrey concluded that Gonzales "showed significant difficulty with the auditory sequential processing of information as seen by his performance on the arithmetic and digit span test as well as on both the visual and auditory memory tests for the Learning Efficiency Exam." Ulrey found it appropriate that Gonzales be given 50% more time for standardized testing, and he suggested that Gonzales record lectures and review written lecture notes.

Ulrey also found that on the Wechsler Scale, Gonzales's verbal and performance skills ranged "from the average to superior range with verbal IQ 109, performance IQ 120 and

---

[1] Ulrey is an Associate Clinical Professor of Psychology at the UCD.

[2] Ulrey wrote that the pattern of errors on Gonzales's tests "strongly suggests an underlying processing disorder"; that "[b]oth Michael's problems with the sequential processing of information visually and auditorily as well as discrepancies between his cognitive level and his reading rate and reading comprehension suggest an underlying learning disability related to slowness in language processing"; and that "the pattern of cognitive skills as well as his ability to improve his performance significantly with increasing 50% time document both his learning disability and the need for the accommodation of increased time for tests."

full scale IQ 115."[3]   Ulrey concluded that Gonzales has "significant strengths both in verbal conceptual ability as well as perceptual organization."

UCD had arranged accommodations for Gonzales during his third and fourth years of study based on Ulrey's report. Also on the basis of Ulrey's report, the UMMS  provided Gonzales with basically the same accommodations he received during his third and fourth years at UCD: extended time on tests, assistance with note-taking, and permission to tape classroom lectures.  UMMS allowed Gonzales double time on examinations.

The NBME referred Gonzales's request and documentation for extended time on the June 1998 Step 1 Examination to Dawn Flanagan, Ph.D., an expert in the field of learning disabilities.[4]  Flanagan opined that Gonzales does not have a learning disability in reading and that the data in the area of written language is insufficient to diagnose a written language disorder.  The NBME denied Gonzales's request for extended

---

[3]Ulrey reported that on the verbal test Gonzales revealed "significant strength in verbal conceptual ability on the vocabulary, comprehension and similarities verbal tests."   He showed "excellent judgement and abstract reasoning on both comprehension and similarities."   On the performance test, he exhibited "significant strength in perceptual organization as seen on both block design and object assembly," and he demonstrated "effective problem solving strategies on both block design and object assembly where he was able to solve even the most abstract designs with a high level of efficiency."   On the achievement test, he had a "reading decoding standard score of 114, equivalent to the 82nd percentile and a written language or spelling standard score of 102, equivalent to the 58th percentile.   Performance on the arithmetic calculation with standard time resulted in a score of 108 equivalent to the 70th percentile and with 50% more time improved his performance to a standard score of 138, equivalent to the 98th percentile."

[4]Flanagan is a member of the American Psychological Association and the National Association of School Psychologists.

of *Kumho Tire Co.* and *Daubert* and deserves to be credited. *See Ekotek Site PRP Committee v. Self*, 1 F. Supp. 2d 1282, 1296 n.5 (D. Utah. 1998) (concluding that district courts presiding over bench trials can decide questions of admissibility and reliability after the proffered evidence is presented at trial); *Bradley v. Brown*, 852 F. Supp. 690, 700 (N.D. Ind.) (granting a motion in limine to exclude unreliable expert evidence following the completion of a bench trial), *aff'd*, 42 F.3d 434 (7th Cir. 1994).  By failing to conduct a *Daubert* analysis as to Dr. Flanagan's testimony (the district court's conclusory statement that it found the testimony of Dr. Flanagan "more persuasive" than that of Dr. Giordani does not constitute such an analysis), the district court effectively terminated Gonzales's case on the merits without employing the evidentiary safeguards that district courts are required to apply when genuine issues of material fact are in dispute—i.e., at a hearing or trial.

In any event, Dr. Flanagan's exclusive reliance on the test results and reports of Drs. Ulrey and Giordani is troublesome. She reasoned that because Gonzales performed well on tests that measured his cognitive skills, and because individuals' cognitive processes are "the best predictors of reading achievement," Gonzales's reading achievement "ought to be within the average or better range of ability."  I am unable to accept this reasoning.

Correlation is the probability that two factors, such as cognitive ability and reading ability, will accompany each other.  A strong positive correlation between cognitive ability and reading ability would mean that, given a large enough sample of people with strong cognitive ability, a predictably large percentage would also have strong reading ability. But Gonzales is a person, not a sample.  Dr. Flanagan's failure to examine or even meet with Gonzales leaves her stuck with relying on the argument that Gonzales's reading ability *ought* to be good because most people with cognitive ability as strong as Gonzales's also have good reading ability.  This reasoning conflicts with, and leaves unexplained, Gonzales's

Dr. Flanagan also never reviewed Gonzales's second or third applications for testing accommodations while those applications were actually pending before the NBME, even though the subject of the present litigation was Gonzales's third application for accommodations. Rather, she reviewed them only for the purpose of testifying on the NBME's behalf in the present case. Gonzales's attorney, in fact, made a motion in limine to limit Dr. Flanagan's testimony to the subject of her initial report in which she criticized Dr. Ulrey's report. The district court denied the motion, stating that "[t]his is merely a hearing, . . . not a trial."

Actually, because the "preliminary" injunctive relief that the district court denied was the lion's share of the relief Gonzales was seeking in this action, I believe that the district court should have considered more carefully what evidence would have been considered competent and admissible at trial. *See* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE: FEDERAL PRACTICE AND PROCEDURE § 2950, p. 241 (2d Cir. 1995 & Supp. 2000) (noting that when the district court consolidates the motion for preliminary injunctive relief with the trial on the merits, "in general the evidentiary rules applicable to trial should govern during a consolidated hearing" because the hearing "really is a trial on the merits").

Although it appears doubtful that private plaintiffs suing under Title III of the ADA are entitled to a jury trial, *see* 42 U.S.C. § 12188 (apparently authorizing only injunctive relief and attorney's fees in Title III suits brought by private plaintiffs); *Abbott v. Bragdon*, 882 F. Supp. 181, 182 (D. Me. 1995) (suggesting that there is no right to a trial by jury in private plaintiffs' suits under Title III), the district court is still required to rely only on admissible and reliable expert testimony, even while conducting a bench trial. This is true even though district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements

time, stating his impairment did not significantly impair a major life activity within the framework of the ADA.

In June 1998, when Gonzales took the Step 1 Examination without accommodations, he failed the examination.

Following its usual practice, the UMMS allowed Gonzales to begin his third-year clinical rotations before he learned the results of his June 1998 Step 1 Examination. When Gonzales learned that he had failed the examination, he had completed one month of a three-month surgical rotation. Gonzales chose to take a leave of absence to prepare to retake the Step 1 Examination.

Before submitting a request for extended time on the October 1998 Step 1 Examination, Gonzales consulted Bruno Giordani ("Giordani"), Ph.D.[5] Giordani diagnosed Gonzales as having a learning disability. Giordani based his diagnosis on Gonzales's history and on formal testing[6] and concluded that Gonzales met the criteria for Reading Disorder (315.00) and for Disorder of Written Expression (315.2). Giordani also found strengths in Gonzales's abilities. Giordani

---

[5] Giordani is an Associate Professor of Psychology in Psychiatry, Director of the Neuropsychology Clinic and Associate Director of the Neuropsychology Division, University of Michigan. Giordani is not board certified in neuropsychology by the American Psychological Association.

[6] The Neuropsychology Division administered the following assessment procedures to Gonzales: Wechsler Adult Intelligence Scale -- Third Edition (WAIS-III); Woodcock-Johnson Tests of Achievement -- Revised (WJ-R); Woodcock Reading Mastery Tests – Revised, Form G (WRMT-R/NU); Nelson-Denny Reading Test (N-D); Halstead-Reitan Neuropsychological Test Battery and Allied Procedures; Wechsler Memory Scale – Revised (WMS-R); Test of Variables of Attention (TOVA); Attentional Capacity Tests (ACT); Digit Vigilance Test; Minnesota Multiphasic Personality Inventory – w (MMPI-2); Patient History; Interview. The tests were administered by Lisa Provost, a Master's Level license psychologist.

reported that Gonzales "scored within the average to superior ranges" on the intelligence test "with a marked difference between the Verbal and Performance subscales of 21 points (Verbal IQ = 100, Performance IQ = 121, Full Scale IQ = 109)."[7]   Giordani compared Gonzales's reading scores to those of fourth year college students and to college graduates. On reading comprehension tests where Gonzales's scores were compared to those of the general population, Giordani reported that Gonzales scored within the average range. Nonetheless, Giordani supported the medical school's decision to grant Gonzales extra time on exams and additional accommodations and recommended that "this accommodation be extended to other settings."

Gonzales presented Giordani's report with his request for extended time on the October 1998 Step 1 Examination. The NBME did not meet with or interview Gonzales. Rather, it sent the documentation Gonzales submitted with his request for accommodations to an expert in the field of learning disabilities, George Litchfield, Ph.D.[8], who reviewed the materials and issued a report. Again, the NBME denied

---

[7] Giordani reported that Gonzales's scores on the Wechsler subtests ranged from "borderline impaired to superior." On academic achievement tests, Gonzales scored "within the above average to superior range" in mathematics "when solving basic written calculations, though his performance with word problems and related tasks fell somewhat lower and in the average to above average ranges."   In cognitive skills, Gonzales demonstrated excellent performance on a conceptual problem solving task requiring general mental flexibility and efficiently [sic] in adapting one's responses based on feedback from the environment (Category Test)."

[8] Litchford is a clinical psychologist.  He is a diplomat in clinical psychology in the State of New York and is a certified school psychologist in the Sate of New York.  Dr. Litchford is also an approved neuropsychological examiner who performs certain certification reviews for the Office of Disabilities at New York State.  He holds a Directorship of Psychological Services in the Psychology Department at the State University of New York.

to making a competent diagnosis of a learning disability.  *See* DSM-IV, p. xxiii ("The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion").  In other contexts, we accord substantial deference to the medical opinions of treating physicians.  *See, e.g.*, *Walker v. Sec'y of Health & Human Svcs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (social security disability benefits case). The same should be true for the opinion of an examining psychologist who has diagnosed a disorder that cannot be reliably detected through test scores alone.

Dr. Flanagan conceded that she did not diagnose Gonzales. She explained that she is an academician, not a clinical psychologist competent to diagnose learning disabilities in specific individuals.  Instead, her opinion was based solely on second-guessing the conclusions reached by Drs. Ulrey and Giordani, who had examined Gonzales.

In particular, Dr. Flanagan testified that based on her review of the data submitted to the NBME by Drs. Ulrey and Giordani, she could find "absolutely no evidence" of an impairment.    She also testified, however, that her methodology for assessing whether persons have learning disabilities was only a "theoretical model that has not been subjected to rigorous empirical analysis for the purposes of diagnosis and treatment."  This leads me to question whether her testimony would satisfy the "gatekeeper" requirements of *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).    Furthermore, to the extent Dr. Flanagan concluded that there was no indication that Gonzales had *any* learning disability, that conclusion was not shared by Dr. Litchford, the NBME's other expert witness.  Dr. Litchford testified that the results of the tests administered by Dr. Giordani supported a finding of a writing disorder, although Dr. Litchford opined that he did not believe that performance on the NBME would be affected by a writing disability.

In plain although admittedly unscientific terms, Gonzales's claim is that the part of his brain responsible for decoding written language is not wired the same as, and functions substantially worse than, that of the average person, even though in other respects his mental faculties are significantly better than average. If, despite this faulty "wiring," Gonzales had been able to adapt so that his ability to read was substantially no worse than that of the average person, then Gonzales would not be considered to have a reading disability under *Kirkingburg*'s rationale. But that is not Gonzales's claim. Rather, Gonzales has asserted that despite his best efforts to work around his problem, he is still not able to read nearly as well as the average person. I do not believe that working around a reading impairment by pursuing strategies in school that minimize the necessity for reading is the type of self-accommodation the Supreme Court had in mind in *Murphy*, *Sutton*, or *Kirkingburg*.

## II.

In addition, the district court's conclusion that Gonzales had no substantial likelihood of success on the merits is seriously flawed because it is based on the finding that Gonzales does not have a disability within the meaning of the ADA. I do not believe that this finding is supported by the record before us.

Of the experts who testified or submitted reports to the district court, the only two who ever met Gonzales were Drs. Ulrey and Giordani. They both concluded that he had a very significant reading disability. The only expert who opined that Gonzales did not have a disability, or at least had not satisfied her that he had a disability, was Dr. Flanagan. Yet Dr. Flanagan never examined or even met with Gonzales, even though under the guidelines set forth by the American Psychiatric Institute's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed. 1994), which the NBME accepts as the appropriate criteria for diagnosing learning disabilities, an interview or clinical examination is essential

Gonzales's request for accommodations. In October 1998, Gonzales took the examination without accommodations and failed.

Gonzales applied to take the Step 1 Examination a third time and documented his request for accommodations. At the request of the NBME, Litchfield reviewed the material and issued a report. The NBME denied his request for accommodations.

Before taking the Step 1 Examination a third time without accommodations, Gonzales filed an action in federal court under the ADA, alleging that the NBME illegally refused to accommodate his disability by failing to provide him with additional time to take the USMLE Step 1. Gonzalez sought, *inter alia*, injunctive relief requiring the NBME to allow extended time on the Step 1 Examination.

After a four-day evidentiary hearing, the district court denied Gonzales's request for injunctive relief, finding that there was no substantial likelihood that Gonzales would succeed on his ADA claim because Gonzales is not disabled under the ADA. The district court rejected Gonzales's claim that he is disabled in the major life activities of reading and writing. The district court credited the NBME's experts, who opined that Gonzales "does not have a documented history of academic achievement below expectations that would support a diagnosis of a learning disability." Based on their testimony, the district court found that "Plaintiff's performance in both reading and writing tests fell within the average to superior range when compared to most people." The district court also held that he was not disabled in the major life activity of working.[9]

---

[9]After the district court denied his request for injunctive relief, Gonzales took the Step 1 Examination a third time without accommodation and again failed.

Gonzales appeals, arguing that the district court erred in holding that he has no likelihood of success of establishing that he has a reading disability under the ADA. Second, he claims that the district court failed to address his writing disability. Third, Gonzales faults the district court's holding that he does not have a disability that affects the major life activity of working.

## II. DISCUSSION

### A. Standard of Review

The ADA includes injunctive relief as an appropriate remedy in disability discrimination. *See* 42 U.S.C.A. § 12188(a)(1) (West 1995) (incorporating the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3). We review a denial of a preliminary injunction for abuse of discretion and afford great deference to the district court's decision. *See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). We will reverse a district court's denial of injunctive relief only if "the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.*

District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction. *See id.* Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal. *See Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).

computer—but without any formal accommodation from the school—would not be considered "disabled" for the purposes of the ADA. Similarly, if a student with severe reading difficulties can get reasonably high marks in school even though it takes him three times as long as the average person to read the required course materials, it would make little sense to say that he does not have a disability in reading. One might say that he is overcoming his disability as far as getting good grades is concerned, but his method or manner of reading would still be substantially limited as compared to the average person.

I recognize that the Supreme Court in its 1999 trilogy of ADA cases, *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516 (1999), *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), broadly held that an individual's ability to self-accommodate or self-correct through medication or treatment must be taken into account in ascertaining whether that person is "disabled" within the meaning of the ADA. The Supreme Court thus held that a hypertensive mechanic whose high blood pressure was controlled by medication was not disabled, *see Murphy*, 527 U.S. at 518-19, and that severely myopic prospective airline pilots whose eyesight with glasses was normal were also not disabled, *see Sutton*, 527 U.S. at 488-89.

Notably, the Supreme Court also held that a truckdriver with amblyopia, an uncorrectable condition that essentially left him with sight in only one eye, might not be "disabled" for the purposes of the ADA if his brain and body had adapted sufficiently so that his ability to see was not substantially impaired in comparison to the average person. *See Kirkingburg*, 527 U.S. at 565-66. The majority's analysis in the present case relies on *Kirkingburg*, reasoning that Gonzales has learned to self-accommodate in a similar fashion. I respectfully disagree.

("[R]eading itself is a major life activity independent of the major life activity of seeing."); *but see Hileman v. City of Dallas*, 115 F.3d 352, 355 n.4 (5th Cir. 1997) (expressing doubt that reading is a "major life activity" for purposes of the Rehabilitation Act).

Gonzales's reasonably good performance in high school and his first two years of college does not foreclose a finding that he has a reading disability. *Cf. Andrew Weis, Jumping to Conclusions in "Jumping the Queue,"* 51 STAN. L. REV. 183, 203 (1998) (book review) (observing that learning-disabled students often are caught in a "Catch-22" situation in that "if we excel in some tasks, then we must not possess a disability, but if we fail in other areas, then we must be just lazy, careless, or inattentive."). Indeed, Gonzales offered a plausible explanation for how he was able to get good grades without formal accommodations despite having a severe reading disability. He testified that he received very significant informal accommodations in high school (e.g., his teachers permitted him to redo unsatisfactory assignments and turn in untimed extra-credit projects). Gonzales also testified that in college he was able to get fairly good grades without formal accommodations simply by employing strategies that allowed him to get by while doing the bare minimum of reading; for example, by tape-recording lectures and having his friends read their lecture notes to him. If getting reasonably good grades were the bottom line, then I would agree that Gonzales is not disabled. Gonzales, after all, is clearly not substantially worse off than the average person when it comes to getting reasonably good grades.

But a person's ability to get good grades is not the bottom line. If it were, then a student's ability to achieve reasonably high marks (by whatever means) without formal accommodations would, as a practical matter, foreclose a finding that he has a reading disability—a conclusion that I believe is incorrect. No one, for example, would argue that a blind student who is able to get good grades in college with the help of friends and an appropriately configured personal

### B. Merits

Title III of the ADA prohibits discrimination against persons with disabilities in professional examinations such as the USMLE Step 1:

> Any person that offers examinations . . . related to applications, licensing, certification, or credentialing for . . . professional, or trade purposes shall offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C.A. § 12189 (West 1995). The DOJ regulations provide that an examination covered by this section be selected and administered to accurately reflect the individual's aptitude or achievement level, rather than his impairment.[10]

A covered entity discriminates against a disabled individual when it fails to make "reasonable accommodations to known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). The regulations implementing Title III of the ADA further clarify that such accommodations "may include changes in

---

[10] The relevant implementing regulation promulgated by the DOJ under Title III states that:
> [A]n examination covered by this section must assure that (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)[.]

28 C.F.R. § 36.309(b)(1)(i) (1999).

the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2) (1999).

The NBME does not dispute that it is a "covered entity" under Subsection III of the ADA. The NBME also does not contest its obligation to provide reasonable accommodations, including extra time to take the Step 1, if a person has a disability. In fact, the NBME's own procedures clearly contemplate the accommodation of individuals with learning disabilities.

Thus, the only question in this case is whether Gonzales is disabled within the meaning of the ADA. A person is disabled within the meaning of the ADA if that individual suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C.A. § 12102(2)(A) (West 1995).

The ADA does not define the terms "physical or mental impairment," "substantially limits," or "major life activities," and no agency has been given authority to issue regulations implementing the generally applicable provisions of the ADA. *See* 42 U.S.C. §§ 12101-12102; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, ---, 119 S. Ct. 2139, 2145 (1999). However, the Department of Justice ("DOJ"), which Congress assigned to write the regulations for Subchapter III of the ADA, defines "physical or mental impairment" as including "specific learning disabilities." 28 C.F.R. § 36.104 (1999). The NBME does not appear to dispute that Gonzales has a mental impairment.

The DOJ's regulations further define "major life activities" as including "walking, seeing, hearing, speaking, breathing, *learning,* and *working.*" *Id.*, § 36.104(2) (emphasis added). The list is merely illustrative, not exhaustive, however, *cf. Cehr v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 780-81 (6th Cir. 1998) (Title I context); and courts have included reading and writing as major life activities under the ADA. *See, e.g., Bartlett v. New York State Bd. of Law*

_____

**DISSENT**

_____

RONALD LEE GILMAN, Circuit Judge, dissenting. Gonzales testified that he has great difficulty reading highway signs while driving, that in stores he feels compelled to sign credit-card receipts blindly because reading them would take him so long that it would make other customers angry, and that one of his attorneys had to read to him line by line the complaint they prepared on his behalf in the present case so that he could understand it. Assuming that he was telling the truth (and there is no suggestion to the contrary), then I cannot understand why he should not be considered "disabled" within the meaning of the ADA.

I.

A primary basis for the district court's conclusion that Gonzales does not have a reading disability is that he was able to get reasonably good grades through his first two years of college, and achieve average standardized test scores, without formal disability accommodations. If Gonzales's claim was that "getting reasonably good grades in school" and "achieving average standardized test scores" were major life activities within the meaning of the ADA, and that those activities were the ones in which he was substantially impaired, the district court might have had a point. But that was not his claim, and, in any event, getting reasonably good grades in school and achieving average standardized test scores are not recognized as "major life activities." Instead, Gonzales claims that he is disabled in the major life activity of reading, which the NBME does not dispute *is* a major life activity under the ADA. *See, e.g., Bartlett v. New York State Board of Law Examiners*, 156 F.3d 321, 324 (2d Cir. 1998), *vacated on other grounds*, 119 S. Ct. 2388 (1999); *Sweet v. Electronic Data Systems, Inc.*, No. 95 Civ. 3987 (MBM), 1996 WL 204471, at *6 (S.D.N.Y. Apr. 26, 1996)

S.Rep. 101-116, *23 (1989).[18]  Given such scant support for Gonzales's proposed definition of substantially limited in the major life activity of working, we decline to adopt his view.

The district court did not err in finding that Plaintiff is not disabled in the major life activity of working.

### III.  CONCLUSION

Because we conclude that Plaintiff has no likelihood of success on the merits, we need not consider whether he would otherwise be entitled to a preliminary injunction.

For the foregoing reasons, the district court's order denying injunctive relief is **AFFIRMED.**

---

[18]As an example, the report states that a person who can walk ten miles continuously but experiences pain on the eleventh mile is not substantially limited in walking because most people are unable to walk eleven miles without suffering some discomfort.  *See* S. Rep. 101-116, *23 (1989).

*Examiners*, 970 F. Supp. 1094, *aff'd,* 156 F.3d 321 (2d Cir. 1998), *vacated,* 119 S. Ct. 1999  (reading and writing)[11]; *see generally Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir. 1998) (learning).  In any event, the NBME does not dispute that reading and writing are substantial life activities.

Rather, this case turns on the key phrase "substantially limits." "Substantially limits" is defined in terms of a general population.  The DOJ regulation states that an individual is substantially limited "when the individual's important life activities are restricted as to the condition, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R., pt. 36, App. B; *see also* 29 C.F.R. § 1630.2(j) (EEOC definition under Title I of "substantially limits"; defining an individual as substantially limited, for most purposes, if he is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity").  Thus, the ADA compares the performance of an

---

[11]The Second Circuit's opinion in *Bartlett* was vacated, not reversed, and the case was sent back for further consideration in light of the Supreme Court's recent decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 1752 (1999); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 119 S. Ct. 2133 (1999); and *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S. Ct. 2162 (1999).  Significantly, the Second Circuit had reversed the district court's holding that the plaintiff's ability to self-accommodate foreclosed a finding of disability.  *See Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d 321, 327 (2d Cir. 1998), *vacated*, 119 S. Ct. 2388 (1999).  This holding is called into question in light of the cited Supreme Court authority.

individual who alleges a restriction in a major life activity to that of "most people."[12]

Gonzales claims that his mental impairments substantially limit him in the major life activities of reading, writing and working.

### 1. Reading

On appeal Gonzales claims that all the credible evidence established that his reading is restricted when compared to the "average" person. Gonzales points to his own testimony[13] regarding his history of reading problems as well as the clinical evidence. He notes that Dr. Ulrey's report contains specific information detailing Gonzales's reading and other processing deficits, as well as his diagnosis, based on those

---

[12]The Supreme Court recently noted that "substantially" suggest "considerable," "specified to a large degree," and "in a substantial manner" and that "substantial" means "considerable in amount, value, or worth," "being that specified to a large degree or in the main," "relating to or proceeding from the essence of a thing; essential," and "of ample or considerable amount, quantity or dimensions." *Sutton,* 119 S. Ct. at 2145. The Supreme Court's review of these definitions confirms that the ADA addresses impairments that limit an individual, not in a trivial or even moderate manner, but in a major way, to a considerable amount, or to a large degree. Under this standard, Gonzales is clearly not disabled under the ADA.

[13]Gonzales testified that throughout his life he has had difficulty reading both in and out of school. He also testified that he has trouble reading street signs and completing consumer transactions because of his reading problems.

The dissent would credit Gonzales's testimony that "he feels compelled to sign credit card receipts blindly because reading them would take him so long that it would make other customers angry, and that one of his attorneys had to read to him line by line the complaint they prepared on his behalf in the present case so that he could understand it." Although the district court did not specifically make the finding, we think Gonzales's verbal representation of his impairment is inconsistent with his success on the SAT and MCAT. Both tests are timed, and Gonzales took these exams without accommodation.

for instance, by reason of [an impairment, from working with others]...then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.

*Sutton,* 119 S. Ct. at 2151 (quoting Tr. of Oral Arg. in *School Bd. of Nassau Co. v. Arline*, O.T. 1986, No. 85-1277, p. 15 (argument of Solicitor General)). It further noted that even the EEOC has reservations about including working as a major life activity and "has suggested that working be viewed as a residual life activity, considered, as a last resort, only '[i]f an individual is not substantially limited with respect to any other major life activity.'" *Id.* (quoting 29 CFR pt. 1630, App. § 1630.2(j)).

Finally, there is no support in the legislative history for Gonzales's position. Rather, the legislative history suggests simply that Congress intended "substantially limits" to be interpreted as significantly restricted in a major life activity in relation to the average person within the population. The Senate Report from the Committee on Labor and Human Resources, submitted by Senator Kennedy, states as follows:

> Persons with minor, trivial impairments, such as a simple infected finger are not impaired in a major life activity. A person is considered an individual with a disability for purposes of the first prong of the definition when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people.

Thus, we must presume that if the DOJ wanted to modify the definition of "substantially limits" regarding the "major life activity of working" it would have expressly done so. In other words, the DOJ's silence is dispositive here. *See Price v. National Bd. of Med. Examin'rs*, 966 F.Supp. 419, 425 (S.D. W. Va. 1997) (holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute); *see generally Bragdon v. Abbott*, 524 U.S. 624, 642 (1998). *But see Bartlett*, 970 F. Supp. at 1099 (adopting EEOC test with respect to the major life activity of working), *and* 2 F. Supp.2d 388, 389-91 (S.D. N.Y. 1997) (denying motion for reconsideration; explaining that use of the major life activity of working standard from Title I is consistent with the spirit and letter of the ADA and DOJ "rule of interpretation" which sanctions the use of regulations from a different title to assist in interpreting a concept that is not addressed in its own regulations ), *aff'd*, 156 F.3d 321 (2d Cir. 1998), *vacated*, 119 S. Ct. 2388 (1999). In any event, as previously noted, Congress did not confer authority on the EEOC (or the DOJ for that matter) to issue regulations regarding the proper interpretation of the term "disability." *See Sutton*, 119 S. Ct. at 2145 (declining to decide the validity of or what deference is due the EEOC's regulations defining "disability" under the ADA because the parties accepted the regulations as valid).

Moreover, Plaintiff's claim to a disability in the major life activity of working is itself problematic.[17] Albeit in dictum, the Supreme Court recently questioned whether working can be deemed a "major life activity" under the ADA:

We note . . . that there may be some conceptual difficulty in defining "major life activities" to include work, for it seems "to argue in a circle to say that if one is excluded,

---

[17]The limitation claimed by Gonzales is in reality a limitation on his ability to read, not his ability to work - and he maintains that his impairments do not restrict his ability to do the work of a doctor.

deficits. Furthermore, Dr. Giordani, who testified at the hearing, concluded that Gonzales met the DSM-IV criteria for Reading Disorder after conducting a full neuropsychological evaluation of Gonzales.

Regarding Gonzales's reading impairment, the district court found that

[w]hen compared to pooled norms, plaintiff[']s scores are squarely in the average to superior range. Of the more than twelve tests administered by Dr. Giordani in 1998, plaintiff scored significantly below average in only one, the Digit Span. In the Digit Span test administered by Dr. Giordani in 1998, plaintiff received a score of five, which is significantly below average and borderline impaired. However, plaintiff's score on the 1998 Digit Span test is clearly suspect. In 1994, plaintiff took another Digit Span test with Dr. Ulrey in which he received a ten, well within the average range. . . . Dr. Flanagan and Dr. Litchford testified at the hearing that because of the wide discrepancy between the two scores, the Digit Span test is an unreliable indicator of plaintiff's ability.

The lower court recognized Dr. Giordani as a "competent and accomplished" psychologist, but ultimately found the testimony of Drs. Litchford and Flanagan "more persuasive," and agreed with their conclusion that based on Gonzales's IQ scores, his performance fell within the average to superior range when compared to most people. Given these findings, the district court concluded that had not demonstrated that he suffered from "an ADA-defined disability" that substantially affects a major life activity.

Upon review of the record, we cannot say that the district court's findings or credibility assessments are clearly erroneous. Flanagan, Defendant's expert witness, testified at the evidentiary hearing that Ulrey's report did not support a diagnosis of Plaintiff having a reading disorder. She stated

that the data she reviewed in terms of Gonzales's cognitive processes and reading achievement provided absolutely no evidence of an impairment. She presented a table of cognitive processes closely associated with reading achievement as assessed by Ulrey and Giordani and concluded that in "all areas that were assessed, all cognitive processes that were assessed that are found to underlie or help us explain or understand reading achievement, he performed in the average to superior range."[14]  Also, she stated that in nine subtests of verbal ability, verbal expression, and verbal comprehension that "his performance was in the average to superior range across a variety of those tasks." She further testified that in phonological processing, his score was in the average range; in visual auditory learning, he performed in the very superior range; and on an inductive reading task, he performed in the superior range.

Flanagan also addressed the one area, memory span, on which Gonzales scored in the impaired range on Giordani's evaluation. She noted that on Ulrey's evaluation Gonzales scored within the average range on the same test and that on another memory span test in Giordani's evaluation Gonzales's performance was average. She stated that the discrepancies in his scores suggest "a very unusual pattern of performance but one that is explained quite simply by possibly unreliability or a chance occurrence." She concluded that Gonzales clearly demonstrated average ability in memory span.[15]

---

[14]The dissent criticizes Dr. Flanagan for relying on tests that measure Gonzales's cognitive skills, skills which predict reading ability. It should be noted that Dr. Flanagan also took into account the results of tests that reflected Gonzales's actual reading achievement level.

[15]The dissent faults Dr. Flanagan because she did not examine Gonzales. The dissent also attacks her conclusions because her methodology for assessing whether persons have learning disabilities involved a theoretical model that had not been empirically analyzed for purposes of treatment and diagnosis. The dissent therefore intimates that Flanagan's testimony might not satisfy the "gatekeeper" requirements of

which governs employment, when in fact he is only alleging a claim under Title III.

The district court appears to have mistakenly analyzed Gonzales's argument as a claim under Title I. Notwithstanding, Gonzales's claim, properly understood, still fails for precisely the same reason that Plaintiff's allegations that he has a learning disability fails: when compared to "most people," his impairments do not substantially limit his ability to work. *See* 28 C.F.R. pt. 36, App. B (DOJ interpretative guidelines, Title III).

To get around this problem, Plaintiff contends that we should look to the EEOC's definition of "substantially limited" as it relates to the "major life activity of *working*", a definition that differs sharply from the definition applicable in every other context:

> The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as *compared to the average person having comparable training, skills, and abilities*. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (1999) (emphasis added). Gonzales claims that under this test, he must be compared with other persons who have completed their second year of medical school; and that when he is compared to this reference group, his difficulty with reading and writing is unquestionably an impairment.

We decline to transplant this definition from the Title I regulations into the Title III regulations. Like the EEOC in Title I, the DOJ in Title III also included "working" in its list of "major life activities," and its definition of "substantially limits," is otherwise identical to the EEOC's "general population" definition of the same term in 29 C.F.R. § 1630.2(j)(1) for major life activities other than working.

learning disability did not affect his academic success, which did not fall below the average student of his age).

Even if self-accommodations enhanced Plaintiff's performance to that of most people, he is not disabled under the ADA. Recently, the Supreme Court ruled that in determining whether individuals are disabled under the ADA they should be examined in their corrected state. *See Sutton*, 119 S. Ct. at 2146; *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, ---, 119 S.Ct. 2133, 2137 (1999). In addition, in *Albertsons*, the Supreme Court held that an individual whose body developed coping mechanisms was not disabled within the framework of the ADA. *See Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 2169 (1999).

In short, there is record evidence to support the district court's conclusion that Gonzales does not have a reading disability for purposes of the ADA.

### 2. Writing

The district court did not separately address Gonzales's alleged writing disability. Gonzales correctly notes that the NBME acknowledged that his "diagnosis of a writing disorder is supported by the test data." The NBME also stated that "writing is not a construct that is measured by the USMLE, so that weak performance in this area would not impact your access to the USMLE program." Gonzales offered no evidence to refute this. In any event, for the reasons discussed above, Gonzales has failed to establish that he is substantially limited by any alleged writing impairment when compared to the average person.

### 3. Working

Alternatively, Gonzales's claim that he is disabled in the major life activity of working. He further alleges that the district court misunderstood that he was alleging an employment discrimination claim under Title I of the ADA,

Litchfield, Defendant's other expert witness, testified that:

> the reading test scores that were submitted were in the average to above average range on the Wide Range Achievement Test, the Woocock [sic] Reading Mastery Test and the Woodcock-Johnson Broad Reading.
> In addition, the Woodcock Reading Mastery Test . . . placed his reading total reading score, reading skill score and reading comprehension score in the average range. The scores were almost exactly equivalent to his full scale IQ. And all of his performances on that test were at a college graduate grade level, sixteen point nine.

Litchfield also explained that the "age level norms" used on the Woodcock test do not approximate the average person as well as pooled norms do. On the Woodcock Reading Mastery, Gonzales scored in the average range even though these tests compared his performance to that of college graduates, his age peers, which is "a statistically driven standard of an average person at his age level." Litchfield explained that "pooled norms," used on the Nelson-Denny Reading Test, "sample from the ninth, tenth, eleventh,

---

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

The dissent's reasoning is flawed. Although as an academic psychologist, Dr. Flanagan is not qualified to diagnose a reading disorder, she is qualified to analyze Gonzales's test results and express an opinion as to how his reading ability compares with that of the average person. Dr. Flanagan focused "on whether Mr. Gonzales has a reading disorder that rises to the level of a disability, that represents an impairment." The dissent goes too far in interpreting Dr. Flanagan's testimony as second-guessing the clinical diagnoses of Drs. Ulrey and Giordani.

Similarly, the fact that Dr. Flanagan relied on a theoretical model that had not been empirically analyzed for purposes of diagnosis and treatment does not preclude her from addressing the substantial limitation question. Dr. Flanagan did not purport to made a diagnosis or suggest treatment; she only determined whether Gonzales's test results were consistent with a substantial impairment in his reading ability. This she was qualified to do under the gatekeeper requirements of *Kumho* and *Daubert*.

twelfth, freshman college, second, third, and fourth year of college" and thus better approximate the average person.

Finally, it should be noted that, consistent with the NBME's experts, Giordani reported that Gonzales scored within the average range on reading comprehension tests, as compared to the general population. Thus, Gonzales's own expert undermines Gonzales's assertion "that despite his best efforts to work around his problem, he is still not able to read nearly as well as the average person." (Dissenting Op. at 4.) In short, Gonzales's impairment simply does not meet the DOJ's definition of "substantially limits," because he can read as well as the average person.

In *Pazer v. New York State Bd. of Law Examiners*, 849 F.Supp. 284 (S.D.N.Y. 1994), the court found "some merit to the argument that a disparity between inherent capacity and performance on a test may, in some circumstances, permit the inference that an individual has a learning disability, even though that individual's performance has met the standard of the ordinary person." *Id.* at 287. However, the *Pazer* court rejected the idea that "such a disparity compels that conclusion as a matter of law," stating "to hold otherwise would compel the conclusion that any underachiever would by definition be learning disabled as a matter of law." *Id.* It gave credence to the defendant's expert who concluded that the plaintiff's "performance level on tests at issue was not consistent with a learning disability." *Id.*

Likewise, in the instant case, Defendant's expert, whom the district court credited, did not find a disparity between Plaintiff's ability and actual achievement. Flanagan testified that "[o]ne of the major indicators of just about every definition of a learning disability is a significant ability achievement discrepancy" but that Gonzales "is achieving

commensurate with what is expected given his IQ."[16]   In other words, Gonzales's achievements are not terribly inconsistent with his IQ scores.

Neither does Plaintiff fit within Congress's vision of the disabled population. In the introductory section to the ADA, "Findings and Purpose," Congress describes the disabled population it seeks to protect. It presents the disabled as isolated and segregated individuals; as individuals who often have "no legal recourse to redress ... discrimination"; and as those who "as a group occupy an inferior status in our society and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C.A. § 12101 (a).

In high school, Plaintiff qualified for advanced placement classes and graduated with a grade point average of 4.3/5.0. He had no formal accommodations for learning disabilities during high school. Plaintiff scored 1050, an average score, on the SAT. He took the test without accommodations. Plaintiff earned a grade point average of 3.15/4.0 at Davis where he majored in physiology. He had accommodations during his third and fourth years at UCD. He took the MCAT twice without accommodations, improving his score on his second attempt by using skills suggested by counselors at Davis. His second MCAT score was high enough that the UMMS admitted him to its program. In short, Gonzales is not a member of the severely disadvantaged group Congress envisioned when it enacted the ADA. *See Bercovitch*, 133 F.3d at 155-56 (holding that the plaintiff, who was diagnosed with ADHD, was not "disabled" under the ADA because his

---

[16]Plaintiff urges this Court to rely upon *Doe v. NBME*, Case No. C-99-3124 WHO (ND Ca 1999), an unpublished decision. *Doe* has a factual similarity to the instant case in that its subject, a medical student, alleges a reading disability and seeks double time on the Step 1 Examination. In *Doe*, however, the court credited plaintiff's expert witnesses and the district court in the instant case credited Defendant's witnesses.